841 A.2d 1000

Gwendolyn PHILLIPS, Administratrix of the Estate of Robyn Jorjean Williams, Deceased; Gwendolyn Phillips, Administratrix of the Estate of Jerome I. Campbell, Deceased; Gwendolyn Phillips, Administratrix of the Estate of Alphonso Crawford, Deceased; Neil Curtis Williams, A Minor By His Guardian and Next Friend, Gwendolyn Phillips,

v.

CRICKET LIGHTERS; Swedish Match, S.A.; Pinkerton Tobacco Company; Pinkerton Group, Inc.; Pinkerton Group, Inc., t/a/d/b/a Cricket USA; Cricket, S.A.; Poppell, B.V.; Wilkinson Sword/Cricket, Inc.; Wilkinson Sword, Inc.; NDC Corporation and National Development Corporation t/a Shenango Park Associates; NDC Asset Management, Inc.; Regional Sales, Inc.; Universal Match Company a/k/a Universal Match Corporation; Swedish Match, A.B.; Cricket, B.V.; Inter–Match, S.A.; Feudor, S.A.; Schick Netherland, B.V.; Warner–Lambert Holland, B.V.

Appeal of Swedish Match, S.A.; Pinkerton Tobacco Company; Pinkerton Group, Inc.; Pinkerton Group, Inc. t/a/d/b/a Cricket, USA; Cricket, S.A.; Poppell, B.V.; Wilkinson Sword/Cricket, Inc.; Wilkinson Sword, Inc.; Universal Match Company a/k/a Universal Match Corporation; Swedish Match, A.B.; Cricket, B.V.; Inter–Match, S.A.; and Feudor, S.A.

Supreme Court of Pennsylvania.

Argued Sept. 9, 2002.

Decided Dec. 3, 2003.

646

Paul R. Robinson, Carl A. Eck, Louis C. Long, Pittsburgh, for Swedish Match, et al.

Brian Thornton Must, for amicus curiae Zippo Manufacturing Company.

James Michael Beck, for amicus curiae Product Liability Advisory Council, Inc.

Edward Michael Koch, Jerrold Paul Anders, Philadelphia, for amicus curiae Pennsylvania Defense Institute.

James William Gicking, Richard A. Kraemer, Philadelphia, for amicus curiae BIC Corporation.

D. Bruce Kehoe, Pro Hac Vice, Indianapolis, IN, John M. Humphrey, Clifford Alan Rieders, Hittle, Kehoe, Humphrey and Rieders, for amicus curiae Shirley and John Hittle.

Henry E. Sewinsky, Rodgers, Perfilio, Heiman & Sewinsky, P.C., Sharon, for Gwendolyn Phillips, et al.

Paul A. Lauricella, Philadelphia, for amicus curiae Pennsylvania Trial Lawyers Association.

BEFORE: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## *OPINION*

Chief Justice CAPPY.

This is an appeal by allowance. We are asked to resolve whether the Superior Court properly reversed, in part, the

trial court's order dismissing all of the claims against the manufacturers and distributors of a cigarette lighter which was allegedly the cause of a fatal fire. For the reasons that follow, we now reverse in part, affirm in part, and vacate in part.

I.

On the night of November 30, 1993, two year old Jerome Campbell ("Jerome") pulled down the purse belonging to his mother, Robyn Williams ("Robyn"), from the top of the family's refrigerator. Jerome retrieved a Cricket disposable butane cigarette lighter from his mother's purse. It is uncontested that this butane lighter lacked any child-resistant feature. Jerome's five year old brother, Neil Williams ("Neil"), observed Jerome use the lighter to ignite some linens. The fire spread to the rest of the family's apartment. After Neil was unsuccessful in his attempts to rouse his mother, he was able to get to a window and began screaming; a neighbor rescued him. Tragically, Robyn, Jerome, and another minor child of Robyn's, Alphonso Crawford, died in the fire.

Gwendolyn Phillips ("Appellee"), as administratrix of the estates of the three decedents and as guardian of Neil, instituted this action against the manufacturers and distributors of the Cricket lighter (collectively, "Appellants").[1] In her complaint, Appellee raised, *inter alia,* claims of design defect sounding in both strict liability and negligence, negligent infliction of emotional distress, breach of the implied warranty of merchantability, and punitive damages. These claims were all predicated on Appellee's allegations that Appellants should have manufactured and distributed a lighter that had child-proof features.

1. Appellee's complaint also named as defendants the owners and managers of the apartment building in which Robyn resided with her family (collectively referred to as the "NDC defendants"). Appellee ultimately negotiated a release with the NDC defendants; the NDC defendants are not involved in this appeal.

Appellants filed for summary judgment. The trial court found in favor of Appellants, and dismissed all claims against them. As to the design defect claim sounding in strict liability, the trial court noted that Appellee was required to establish that the Cricket lighter was unsafe for its intended use. Tr. ct. slip op. at 16–17 (citing *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978)). The trial court reasoned that "[t]he term 'intended use' necessarily entails the participation of the 'intended user'." *Id.* at 17 (citation omitted). Since a two year old child was not the intended user of a cigarette lighter, the trial court found that Appellants could not be liable in strict liability. In addition, the court reasoned that where a product is found to be not defective for strict liability purposes, then a design defect claim sounding in negligence also must fail; it thus dismissed the negligent design claim. *Id.* at 30. The trial court also dismissed the negligent infliction of emotional distress claim, reasoning that such a claim must be dismissed because Appellee had failed to state a cause of action for negligence. *Id.* at 36. As to the breach of warranty claim, the trial court found that Appellee had failed to show that the Cricket lighter was not fit for its ordinary purposes of producing a flame. *Id.* at 31–32. Finally, the court stated that since there was no evidence of wanton or willful misconduct on Appellants' part, then the punitive damages claim must also be dismissed. *Id.* at 38.[2]

On appeal, Appellee presented five issues to the Superior Court, claiming that summary judgment should not have been entered on her breach of warranty, negligent infliction of emotional distress, or design defect claims sounding in strict liability or negligence. The Superior Court reversed the trial court's entry of summary judgment on all five of these claims.[3]

As to the strict liability claim, the Superior Court emphatically rejected the trial court's holding that for strict liability

2. The trial court also entered summary judgment on several other claims. As Appellee has not challenged the entry of summary judgment on these claims, we need not detail the trial court's disposition of them.

3. The Superior Court noted that Appellee had not appealed the entry of summary judgment on several other claims, as it was compelled to affirm that portion of the trial court's order dismissing those claims.

purposes, a product must be designed to be safe only for the "intended user". *Phillips v. Cricket Lighters*, 773 A.2d 802, 810–13 (Pa.Super.Ct.2001). Rather, the court posited that the product must be safe for its intended use, which it found was to create a flame, when used by any user, either intended or unintended. *Id.* at 813. The court concluded that the Cricket lighter was unsafe because its failure to incorporate a child safety feature allowed it to be operated by an unintended user, namely a small child, thus exposing the child and others to a grave risk of harm. It therefore reversed the trial court's entry of summary judgment on the design defect claim sounding in strict liability.

As to the negligent design claim, the Superior Court noted that the trial court had entered summary judgment because the strict liability claim had been dismissed; the Superior Court reasoned that since it had found that the trial court's determination on the strict liability claim to be erroneous, it must perforce reverse the entry of summary judgment on the negligent design claim. Concomitantly, the Superior Court reversed the entry of summary judgment on the negligent infliction of emotional distress claim as the trial court had dismissed this claim on the basis that the negligence claim had failed.

The Superior Court also reasoned that it must reverse dismissal of the punitive damages claim. In reviewing this issue, the Superior Court expressed the belief that the trial court had dismissed this claim solely because Appellee had no other viable causes of action, and that a punitive damages claim may survive only where there are other viable tort actions. The Superior Court concluded that since it had reinstated four other tort claims raised by Appellee, then the trial court's entry of summary judgment on the punitive damages claim must be reversed.

Finally, the Superior Court did expressly state that it was reversing the trial court's entry of summary judgment on the breach of warranty claim. Yet, the Superior Court provided no analysis as to how it arrived at this conclusion.

Appellants filed a petition for allowance of appeal, which we granted. This appeal then followed.

■■■■ Appellants contend that the Superior Court erred in reversing the trial court's entry of summary judgment on the strict liability, negligence, negligent infliction of emotional distress, breach of warranty, and punitive damages claims. In reviewing these claims, we examine whether the Superior Court erred in its application of the appellate standard of review of a trial court's entry of summary judgment. That standard declares that an appellate court may reverse the entry of summary judgment only where it finds that the trial court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. *See Pappas v. Asbel*, 564 Pa. 407, 768 A.2d 1089 (2001). In making this assessment, "we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Ertel v. Patriot–News Co.*, 544 Pa. 93, 674 A.2d 1038, 1041 (1996). As such an inquiry involves solely questions of law, our review is *de novo*.

## II

Appellants' first claim is that the Cricket lighter was not defective pursuant to § 402A of the Restatement (Second) of Torts. They argue that this court has long held that a product is not defective where it is safe for its "intended use". Echoing the reasoning of the trial court, Appellants argue that a necessary corollary to the "intended use" doctrine is that the product must have been utilized by an "intended user".

■■■ Appellants are correct in stating that under Pennsylvania law, a product will be deemed defective only if it "left the supplier's control lacking any element necessary to make it safe for its *intended use* or possessing any feature that renders it unsafe for the *intended use*." *Azzarello*, 391 A.2d at 1027 (emphasis supplied).

*Azzarello* did not, however, answer whether the "intended use" doctrine necessarily encompassed the requirement that the product need be made safe only for its "intended user". While we have never addressed that question in a strict liability design defect matter, we have explicitly resolved it in a strict liability failure to warn context. *See Mackowick v. Westinghouse Electric Corp.*, 525 Pa. 52, 575 A.2d 100 (1990). In *Mackowick*, an electrician, who was one of the plaintiffs in the suit, was injured when electricity arced from a capacitor. The plaintiffs argued that the electrical capacitor was defective because the manufacturer failed to place a warning on the capacitor regarding the dangers of live, exposed electrical wires.

We rejected this argument. We reasoned that a product need be made safe only for its intended user. *Id.* at 102 and 103. We noted that the electrical capacitor was intended to be accessed and used only by qualified electricians, and not general members of the public. As experienced electricians are aware of the danger of live, exposed electrical wires, we concluded that the product was safe for its intended user even absent such a warning.

While *Mackowick* was a failure to warn case, we find that the principle it enunciated is equally applicable to design defect cases. In fact, we cannot perceive how it could be confined exclusively to the failure to warn context. *Mackowick* stands for the proposition that a product is not defective so long as it is safe for its intended user. Whether the product is allegedly defective due to a lack of a warning, or because its design was ill-conceived, the standard that the product need be made safe only for the intended user appears to be equally applicable.

Yet, there are two primary arguments against utilizing the intended user standard as part of the strict liability design defect test that we must address. The first was articulated by the Superior Court in its opinion below. One of the Superior Court's reasons for rejecting Appellants' argument that a product is not defective if it is safe for the intended user was

that such an argument "harkens back to privity principles that were expressly abrogated by the adoption of products liability law." *Phillips*, 773 A.2d at 811. The Superior Court viewed utilization of the intended user standard as effectively rolling back the clock.

This concern is phantasmic. The Superior Court is correct in concluding that the concept of privity of contract has no place in our strict liability law. *See Azzarello, supra.* Yet, a declaration that a product is nondefective for strict liability purposes if it is safe for use by its intended user does not reanimate the privity requirement. For parties to be considered to be in privity, a contractual relationship must exist between them. *See Salvador v. Atlantic Steel Boiler Co.*, 457 Pa. 24, 319 A.2d 903, 904 n. 1 (1974). The intended user doctrine, however, requires no such contractual relationship. For example, in terms of the butane lighter, any adult who borrowed the lighter from the person who purchased it could be considered an intended user, regardless of the fact that such an adult had no contractual relationship with the manufacturer or distributor of the lighter. Thus, we reject the argument that the intended user doctrine will somehow pollute strict liability with privity requirements.

A second counter-argument to the intended user doctrine is advanced by Appellee. She asserts that the intended user test is artificially narrow. In its stead, she proposes that we examine whether the actual user—whether he was the intended user or not—was a reasonably foreseeable one. Appellee states that since it was reasonably foreseeable that a small child may play with a butane lighter, and that grievous damages could result if a child safety device were not placed on the lighter, then strict liability should still attach even though the child was not the intended user.

There is some visceral appeal to Appellee's argument. For most people—whether learned in the law or laypersons—it is only just that a party who could have foreseen and avoided injuring another, but who fails to do so, is held liable for any injuries caused. This visceral response has been memorialized

in our tort law as a negligence cause of action. *See, e.g.,* *Morena v. South Hills Health System,* 501 Pa. 634, 462 A.2d 680, 684 (1983).

Yet, the cause of action presently being examined is not a negligence claim; rather, it sounds in strict liability.[4] And strict liability affords no latitude for the utilization of foreseeability concepts such as those proposed by Appellee. We have bluntly stated that

> negligence concepts have no place in a case based on strict liability. Indeed, Section 402A of the Restatement (Second) of Torts makes it clear that the imposition of strict liability for a product defect is not affected by the fact that the manufacturer or other supplier has exercised "all possible care."

*Lewis v. Coffing Hoist Division, Duff–Norton Co., Inc.,* 515 Pa. 334, 528 A.2d 590, 593 (1987). This approach is militated by the fact that our strict liability law places "the product itself . . . on trial, and not the manufacturer's conduct." *Id.* *Accord Kimco Development Corp. v. Michael D's Carpet Outlets,* 536 Pa. 1, 637 A.2d 603, 606 (1993) ("[W]e have been adamant that negligence concepts have no place in a strict liability action."); *Spino v. John S. Tilley Ladder Co.,* 548 Pa. 286, 696 A.2d 1169, 1172 (1997) ("Evidence of due care by a defendant is both irrelevant and inadmissible in a products liability case since a manufacturer may be strictly liable even if it used the utmost care.")

To give Appellee her due, however, we would be remiss if we did not recognize that this court has at times committed the same error. While we have remained steadfast in our proclamations that negligence concepts should not be imported into strict liability law,[5] we have muddied the waters at times

---

4. Later in this opinion, we will have the opportunity to examine whether Appellee has made out a negligence-based design defect claim. *See infra.*

5. *Amicus curiae* Product Liability Advisory Council, Inc. ("PLAC") would take issue with this statement. In PLAC's view, this court in *Duchess v. Langston Corp.,* 564 Pa. 529, 769 A.2d 1131 (2001) recently proclaimed that negligence and strict liability are coterminous. We

with the careless use of negligence terms in the strict liability arena. One example of this mixing of negligence terms into a strict liability analysis occurs in *Davis v. Berwind Corp.*, 547 Pa. 260, 690 A.2d 186 (1997). In that matter, one of the questions presented to this court was whether the manufacturer could be held strictly liable where it had manufactured a safe product, but the product was rendered unsafe by subsequent changes. We reasoned that the manufacturer may be held liable, even though it did not make the subsequent change, if the "manufacturer could have reasonably expected or foreseen such an alteration of its product." *Id.* at 190. Clearly, such a negligence-based test, which focuses on the due care exercised by the manufacturer, is in tension with our firm and repeated pronouncements that negligence concepts have no place in strict liability law.

While it would be imprudent of us to wholesale reverse all strict liability decisions which utilize negligence terms, we can, and do, reaffirm that in this jurisdiction, negligence concepts have no place in strict liability law. Such a firm division between the causes of action is not a senseless exercise in semantics; rather, it is dictated by the very underpinnings of the strict liability cause of action. Strict liability focuses solely on the product, and is divorced from the conduct of the manufacturer. *See Lewis, supra.* With such a cause of action, it would be the height of illogic to introduce a test which examines whether the manufacturer acted with due care.

Recognition that strict liability is not a type of mongrel derivative of negligence is also consistent with the historical

made no such statement in *Duchess*. In *Duchess*, this court was asked to determine whether evidence of subsequent remedial measures could be used as substantive evidence of a design defect in a strict liability case, where such evidence would be barred in a negligence case. In analyzing this claim, we exhaustively detailed analyses offered by various courts. The passages on which PLAC relies are primarily where this court quotes from the reasoning employed by other courts, without this court endorsing such reasoning. *See, e.g., id.* at 1141; and at 1141 n. 14. In no fashion did we state that negligence and strict liability were one in the same cause of action, and we expressly disavow such an interpretation of *Duchess*.

development of this cause of action. Strict liability was intended to be a cause of action separate and distinct from negligence, designed to fill a perceived gap in our tort law. *Azzarello*, 391 A.2d at 1023–24. This court recognized that in a modern industrial society, liability should not necessarily be predicated only on a finding that the defendant failed to exercise due care. Rather, we adopted the strict liability cause of action, finding "that the risk of loss must be placed upon the supplier of the defective product without regard to fault. . . ." *Id.* at 1024.

Thus, we conclude that in a strict liability design defect claim, the plaintiff must establish that the product was unsafe for its intended user. We also explicitly state that a manufacturer will not be held strictly liable for failing to design a product that was safe for use by any reasonably foreseeable user as such a standard would improperly import negligence concepts into strict liability law.

In applying this test to the matter *sub judice*, it is apparent that the trial court properly entered summary judgment on this claim. Appellee does not contest that the butane lighter was intended to be used solely by adults, and not a two year old such as Jerome. Furthermore, she also does not contend that as designed, it was unsafe for use by such an intended user. Accordingly, we conclude that the trial court properly determined that Appellee's strict liability claim could not be sustained pursuant to § 402A, and thus reverse the Superior Court's finding on this issue.[6]

**6.** In arguing their position on the strict liability claim, Appellants assert that if this court were not to find in their favor on their § 402A claim, then we should consider, in the alternative, rejecting § 402A in favor of the Restatement (Third) of Torts' new definition for strict liability claims and awarding them relief based upon that provision. *See* Restatement (Third) of Torts, Products Liability, § 2 (1997).

We will not consider Appellants' issue vis-à-vis the Restatement (Third) of Torts for two reasons. First, Appellants did not argue in their Petition for Allowance of Appeal that we should consider abandoning our current interpretation of strict liability law and adopt the Restatement (Third) of Torts' new definition of this cause of action; thus, the issue has been waived. *Shoemaker v. Lehigh Township*, 544 Pa. 304, 676 A.2d 216, 220 n. 3 (1996). Second, even if the issue were

## III

Appellants' next claim is that the Superior Court erred in reversing the trial court's grant of summary judgment on Appellee's claim that Appellants negligently designed the Cricket lighter. The crux of their argument is that if we deem that the trial court properly granted summary judgment on Appellee's strict liability claim, then perforce we must hold that her negligence claim also fails.

This reasoning is deeply flawed and we decline to adopt it. As we discussed *supra*, negligence and strict liability are distinct legal theories. Strict liability examines the product itself, and sternly eschews considerations of the reasonableness of the conduct of the manufacturer. *See Lewis, supra.* In contrast, a negligence cause of action revolves around an examination of the conduct of the defendant. Were we to dispose of a negligence claim merely by an examination of the product, without inquiring into the reasonableness of the manufacturer's conduct in creating and distributing such a product, we would be divorcing our analysis from the elements of the tort. Thus, as the elements of the causes of action are quite distinct, it would be illogical for us to dispose of Appellee's negligence claim based solely on our disposition of her strict liability claim. Instead, we must examine the law of negligence and determine whether the trial court erroneously determined that Appellee's negligence claim failed as a matter of law.

 It is axiomatic that in order to maintain a negligence action, the plaintiff must show that the defendant had a duty "to conform to a certain standard of conduct;" that the defendant breached that duty; that such breach caused the injury in question; and actual loss or damage. *See Morena,* 462 A.2d at 684 n. 5.

 Of these four elements, the primary one is whether the defendant owed a duty of care. *Althaus v. Cohen,* 562 Pa.

not waived, there would be no need for us to examine whether Appellants were entitled to relief on this alternative basis as we have determined that their primary argument is meritorious.

547, 756 A.2d 1166, 1168 (2000). To determine whether the defendant owed a duty of care, we must weigh the following five factors: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." *Id.* at 1169. No one of these five factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant.

In applying the *Althaus* test to the instant matter, we remain cognizant of the fact that we are reviewing the entry of summary judgment on this claim. Thus, as noted *supra,* we are directed to "view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Ertel,* 674 A.2d at 1041.

As to the first prong of the *Althaus* test, there was clearly a relationship between Robyn, as the purchaser of the butane lighter, and Appellants. Thus, as to the negligence claim springing from Robyn's death, this prong weighs in favor of finding a duty. The existence of a relationship between Robyn's children and Appellants, however, is less certain. Thus, as to the negligence claims linked with the estates of the two deceased children and with Neil, the surviving child, we are unable to find that this factor weighs in favor of finding a duty.

Next, we examine the social utility of Appellants' conduct, namely, the production of a butane lighter without child safety features. A butane lighter has obvious social utility as a reliable, convenient method to create a flame. Yet, the benefits of one lacking a child resistant feature are not so plain. When taken in the light most favorable to Appellee, the evidence does not show that the utility of the lighter is increased when a child safety device is lacking. Conversely, it is readily apparent that a device which would prevent small children, who lack the discretion and caution of the average

adult, from creating a flame would have great utility in our society. Thus, we find that this factor weighs in favor of finding a duty on the part of Appellants.

Third, we must examine the nature of the risk imposed and the foreseeability of the harm incurred. Taken in the light most favorable to Appellee, the evidence established that the risk of injury and property damage resulting from children playing with lighters lacking child safety devices was substantial. Appellee adduced evidence establishing that fires caused by children playing with butane lighters resulted in the deaths of 120 people per year, with an additional 750 people being injured in these fires. Expert Report and Affidavit of John O. Geremia, Ph.D. ("Geremia Affidavit") at 7 (citing the Consumer Product Safety Commission's report on child-resistant cigarette lighters, 53 Fed.Reg. 6833–01 (March 3, 1988)). Furthermore, evidence introduced by Appellee established that the estimated annual cost of child-play butane lighter fires to be between $300–375 million, or 60 to 75 cents per lighter sold. *Id.* Appellee also introduced evidence that it was reasonably foreseeable to Appellants that their butane lighter would fall into the hands of small children, some of whom would, without being prevented by a child safety device, start fires which would result in severe and potentially fatal injuries to people and great damage to property. *Id.* at 11.

We find that this evidence establishes that the risk imposed by lack of child-safety features is a serious one and that the harm was foreseeable by Appellants. Thus, we find that the third prong of the *Althaus* test weighs in favor of the finding of a duty.

Next, we must consider the consequences of imposing a duty. The addition of child safety devices would clearly increase the cost of manufacturing butane lighters. Yet, Appellee adduced evidence that such a cost would be nominal. *See* Geremia Affidavit at 11–12. Considering that the consequences of imposing this duty on Appellants would be minimal, this factor also weighs in favor of finding a duty.

Finally, we must consider the public interest in imposing a duty upon butane lighter manufacturers to produce a lighter with child safety features. We find that there is a strong public interest in minimizing fires started as a result of children playing with butane lighters. Such fires have catastrophic effects on human beings as well as property. Avoidance of them would be an unquestionable boon to society. Thus, this factor weighs in favor of finding a duty.

In weighing all five of the *Althaus* factors, when viewing the evidence in the light most favorable to Appellee as nonmoving party, we find that there was an issue on whether Appellants owed a duty of care. As to the negligence claim arising out of Robyn's death, all five factors, to a greater or lesser extent, weigh in favor of finding such a duty. As to the claims in connection with Robyn's children, only the first prong does not weigh in favor of finding a duty. Yet, the weight attributable to the other four prongs is such that we must conclude that Appellee has adduced sufficient evidence such that these claims survive summary judgment on the issue of the existence of a duty of care.

We now turn to examining the three remaining prongs of the negligence test, namely whether Appellants breached their duty, whether that breach caused the injuries in question, and whether there were damages. *See Morena, supra.* These three prongs can be examined much more expeditiously than the duty prong. As the parties do not contest that the butane lighter in question lacked a child-safety device, then there is clearly evidence to support a finding that Appellants breached their duty. Next, it is unquestionable that there is evidence of causation. The fire was started by a two year old child playing with a butane lighter lacking a safety device; with such evidence, we cannot say, as a matter of law, that there was no causation. Finally, it is tragically apparent that there were damages. In addition to property damage, three human beings lost their lives, and the surviving child is now bereft of his family.

For the foregoing reasons, we conclude that Appellee introduced evidence such that there was a jury question as to

whether Appellants were negligent in designing a butane lighter that lacked a child safety device. We thus affirm the Superior Court's reinstatement of this claim, although we do so on different grounds.

## IV

Appellants' next claim is that the Superior Court improperly reversed the trial court's entry of summary judgment on the negligent infliction of emotional distress claim. We disagree. The trial court entered summary judgment on the negligent infliction of emotional distress claim solely on the basis that since Appellee had "failed to state a cause of action for negligence, we must necessarily conclude that there is no basis for a claim of negligent infliction of emotional distress." Tr. ct. slip op. at 36. As stated *supra,* however, we have concluded that the trial court had erred when it entered summary judgment on the negligence claim. Since the sole rationale for the trial court's entry of summary judgment on the negligent infliction of emotional distress claims has been discredited, we agree with the Superior Court that the trial court erred in entering summary judgment on this count. Thus, we affirm that portion of the Superior Court's order.

## V

The next issue with which we must contend is whether the Superior Court properly reversed the trial court's entry of summary judgment on breach of the implied warranty of merchantability claim. Unfortunately, while the Superior Court's order clearly stated that it was reversing the trial court on this claim, *see Phillips,* 773 A.2d at 816, the Superior Court provided absolutely no analysis as to how it reached this conclusion. As we cannot review the propriety of its determination absent any reasoning, and are chary of assuming what the reasoning might have been and conducting our review on that basis, we are constrained to vacate this portion of the Superior Court's order and remand with directions for it to explain its rationale in reversing the trial court's entry of summary judgment on the breach of warranty claim.

## VI

Finally, we must examine whether the Superior Court properly reversed the trial court's entry of summary judgment on Appellee's punitive damages claim. In reviewing Appellee's claim that the trial court improperly entered summary judgment on this claim, the Superior Court apparently understood the sole basis for the trial court's decision to be that the punitive damages claim could not be sustained where all other remaining tort claims have been dismissed. *See Phillips*, 773 A.2d at 805 and 816. With this predicate understanding of the trial court's reasoning, the Superior Court concluded that "since we have concluded that [Appellee] has viable causes of action, and the punitive damages claim was dismissed [by the trial court] on the ground that [Appellee] did not, we must reverse dismissal of the punitive damages claim." *Id.* at 816.

Had the Superior Court's grasp of the trial court's opinion been correct, its analysis would be unassailable and we would be constrained to affirm its reinstatement of the punitive damages claim. Unfortunately, the Superior Court misapprehended the reasoning of the trial court. In dismissing this claim, the trial court did not provide as either its sole, or even alternative, basis the reasoning that summary judgment was appropriate because a punitive damages claim is not sustainable where all other tort claims have been dismissed. Rather, it found that summary judgment should enter on this claim because Appellee had failed to adduce sufficient evidence; namely, the court found that Appellee had not shown that Appellants had acted in wanton fashion or engaged in willful misconduct. Tr. ct. slip op. at 38.

Thus, the Superior Court reversed the trial court's entry of summary judgment on this claim based on a mistaken understanding of the trial court's reasoning. We must therefore reverse that portion of the Superior Court's reinstating the punitive damages claim, and remand this issue for the court's reconsideration of this issue.

For the foregoing reasons, we reverse that portion of the Superior Court's order reinstating the strict liability design

defect claim. Furthermore, we affirm that portion of the order which reinstates the negligence and negligent infliction of emotional distress claims. We also vacate that portion of the order reinstating the breach of warranty claim, and remand with directions to the Superior Court to provide reasoning on its disposition of that claim. Finally, we reverse the Superior Court's reinstatement of the punitive damages claim and remand that issue to that court for reconsideration.

Jurisdiction is relinquished.

Former Chief Justice ZAPPALA did not participate in the decision of this matter.

Justice SAYLOR files a concurring opinion joined by Justices CASTILLE and EAKIN.

Justice NIGRO concurs in the result.

Justice NEWMAN files a concurring and dissenting opinion.

## *CONCURRING OPINION*

Justice SAYLOR.

As a pillar of their reasoning concerning the character of strict products liability doctrine in Pennsylvania, the lead Justices retrench the Court's periodic admonishment to the effect that negligence concepts have no place in a strict liability action. A decided majority of courts and commentators, however, have come to recognize that this proposition cannot be justly sustained in theory in relation to strict products liability cases predicated on defective design; moreover, it is demonstrably incongruent with design-defect strict liability doctrine as it is currently implemented in Pennsylvania trial courts and in federal district courts applying Pennsylvania law. Furthermore, while the parties to the litigation underlying this appeal may not have expressly developed the approach of the products liability segment of the Third Restatement as such in their submissions, the Restatement position represents a synthesis of law derived from reasoned, mainstream, modern consensus. Particularly in light of perva-

sive ambiguities and inconsistencies in prevailing Pennsylvania jurisprudence in this area, I view this appeal as an opportunity to examine the range of readily accessible, corrective measures. In my judgment, the Restatement's considered approach illuminates the most viable route to providing essential clarification and remediation, at least on a prospective basis. Ultimately, I join the majority disposition on the strict liability and negligence claims under present law. My reasoning follows.

## I. Central conceptions borrowed from negligence theory are embedded in strict products liability doctrine in Pennsylvania.

First off, the lead opinion acknowledges that under prevailing authority of this Court, foreseeability, a conception firmly rooted in negligence theory, is assessed in strict liability cases involving certain types of product alterations. *See* Opinion, 576 Pa. at 654-57, at 1006–07 (citing *Davis v. Berwind Corp.*, 547 Pa. 260, 690 A.2d 186 (1997)). Since they decline to disavow this precept, the lead Justices' broad proclamation that "negligence concepts have no place in strict liability law," *id.* at ——, at 1007, is disproved on the face of their own analysis. Of course, the product alteration scenario is but one discrete aspect of strict liability doctrine. But even more fundamentally, Pennsylvania trial and appellate courts, and federal courts applying Pennsylvania law, have been employing other aspects of negligence theory as central principles controlling design defect litigation for more than twenty years.

*Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), accepted that a manufacturer or supplier should be liable for sale or distribution of a product "in a defective condition unreasonably dangerous" to the user or consumer or his property, thus bringing the basic framework of Section 402A of the Second Restatement of Torts into the jurisprudence. *See id.* at 427, 220 A.2d at 854. Significantly, scholars have pointed out that Section 402A developed in a landscape in which most of the relevant litigation centered on manufacturing, as opposed to

design, defects.[1] *See, e.g.,* John W. Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS. L.J. 825, 825 (1973) ("The prototype case was that in which something went wrong in the manufacturing process, so that the product had a loose screw or a defective or missing part or a deleterious element, and was not the safe product it was intended to be.").[2] A primary difficulty facing injured plaintiffs in the manufacturing defect line of cases was that, although an undisputed defect may have affected the safety of a final product, there remained inherent and often insurmountable obstacles to proof that the manufacturer failed to exercise due care in the production process, as would be necessary to sustenance of a cause of action grounded in negligence. One of the core objectives of Section 402A was to relieve plaintiffs of such burden. *See* Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. at 825–26 ("No longer was it necessary [under Section 402A] to prove negligence on the part of some employee in the assembly line or in the system under which the line functioned or in failing to inspect the finished product adequately."). *See generally Griggs v. BIC Corp.,* 981 F.2d 1429, 1432 (3d Cir.1992).[3]

**1.** The analytical division of product defects into the three categories of manufacturing, warning, and design defects is now generally accepted. *See* James A. Henderson, Jr., and Aaron D. Twerski, *Achieving Consensus on Defective Product Design,* 83 CORNELL L.REV. 867, 869 (1998).

**2.** *See also* Richard L. Cupp, Jr. and Danielle Polage, *The Rhetoric of Strict Products Liability Versus Negligence: An Empirical Analysis,* 77 N.Y.U.L.REV. 874, 890 (2002) ("Most of the early cases did not entail claims of defectiveness that could, even in retrospect, be classified as design claims."); Henderson and Twerski, *Achieving Consensus on Defective Product Design,* 83 CORNELL L.REV. at 880 (observing that "[t]he simple truth is that liability for defective design was in its nascent stages in the early 1960s and section 402A did not address it meaningfully, if at all.").

**3.** The other primary rationale underlying the development of strict products liability was loss-spreading. *See* Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS. L.J. at 826 ("The idea is that the loss should not be allowed to remain with the injured party on whom it fortuitously fell, but should be transferred to the manufacturer, who, by pricing his product, can spread it among all the consumers."). Dean John W. Wade also noted that "[t]he extent to which a manufacturer may be free to 'spread the risk' created by his product can be the subject of some debate[,]" *id.;* furthermore, courts have recognized

Nevertheless, the intent of the Second Restatement was not to render the manufacturer an insurer of his product, responsible for any and all harm caused from the use of its product, regardless of the product's utility and relative safety. *See, e.g., Azzarello v. Black Bros. Co.*, 480 Pa. 547, 555, 391 A.2d 1020, 1025 (1978). In order to impose appropriate limitations on the doctrine, therefore, as design defect litigation evolved, courts generally, and Pennsylvania courts in particular, recognized an integral role for risk-utility (or cost-benefit) balancing, derived from negligence theory.[4] This was alluded to in *Azzarello*, 480 Pa. at 558, 391 A.2d at 1026 (suggesting that a court inquire as to whether "the utility of a product outweigh[s] the unavoidable danger it may pose"), and essentially engrafted on Pennsylvania law in *Burch v. Sears, Roebuck & Co.*, 320 Pa.Super. 444, 450, 467 A.2d 615, 618 (1983) ("The finding of a defect requires a balancing of the utility of the product against the seriousness and likelihood of the injury and the availability of precautions that, though not foolproof, might prevent the injury."), and *Dambacher ex rel. Dambacher v. Mallis*, 336 Pa.Super. 22, 50, 485 A.2d 408, 422 (1984).[5]

inherent limitations on the just implementation of loss spreading via judicially crafted doctrine. *See, e.g., Duchess v. Langston Corp.*, 564 Pa. 529, 552, 769 A.2d 1131, 1145 (2001).

**4.** As explained by one commentator:

Section 402A contained an internal tension: Its declaration that a manufacturer would be liable even if it "exercised all possible care in the preparation and sale of [its] product" was bounded by its application only to products that were "in a defective condition unreasonably dangerous to the user or consumer or to his property." Thus, the section's strict-liability rule was tempered by a negligence-based concept of defect.

George W. Conk, *Is There a Design Defect in the Restatement (Third) of Torts: Products Liability?*, 109 YALE L.J. 1087, 1092 (2000) (footnote omitted).

**5.** *See, e.g., Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1044–45 (3d Cir.1997) (recognizing the "long hegemony" of cost-benefit analysis under Pennsylvania law); *Hittle v. Scripto–Tokai Corp.*, 166 F.Supp.2d 159, 164 (M.D.Pa.2001); *Bowersfield v. Suzuki Motor Corp.*, 111 F.Supp.2d 612, 617 (E.D.Pa.2000); *Van Buskirk ex rel. Van Buskirk v. West Bend Co.*, 100 F.Supp.2d 281, 283 (E.D.Pa.1999); *Schindler v. Sofamor, Inc.*, 774 A.2d 765, 772–73 (Pa.Super.2001); *Phillips ex rel. Estate of Williams v. Cricket Lighters*, 773 A.2d 802, 813–14 (Pa.Super.2001). *See generally* John M. Thomas, *Defining "Design Defect" in*

Both *Azzarello* and *Dambacher* evaluated, and considered favorably, portions of a seminal article by Dean John W. Wade in elaborating on such construct, in which Dean Wade also highlighted the marked similarities between negligence and strict liability in defective design cases, *see* Wade, *On the Nature of Strict Liability for Products*, 44 Miss. L.J. at 837–38, as well as the direct derivation of strict liability risk-utility balancing from negligence doctrine. *See id.*[6]

*Pennsylvania: Reconciling Azzarello and the Restatement (Third) of Torts*, 71 Temp. L.Rev. 217, 223 (1998) ("Pennsylvania appellate courts following *Azzarello* have concluded, almost uniformly, that a cost-benefit analysis must be used in determining whether a product is 'defective' or 'unreasonably dangerous.' ").

6. *See also* Cupp and Polage, *The Rhetoric of Strict Products Liability Versus Negligence*, 77 N.Y.U.L. Rev. at 882–83 ("An increasing number of courts and writers have agreed with the Reporters that risk/utility balancing requiring a reasonable alternative design is usually the appropriate test in design defect cases, and that in these cases strict liability risk/utility balancing is substantively no different from negligence risk/utility balancing[;][r]egardless of the label, the underlying approach is increasingly one of simple negligence." (footnotes omitted)); Conk, *Is There a Design Defect in the Restatement (Third) of Torts: Products Liability?*, 109 Yale L.J. at 1094 ("To summarize, the Restatement (Second)'s section 402A embodied a strict-liability rule, tempered with negligence elements . . . ."); *id.* at 1087–88 (describing "risk-utility analysis" as "a negligence-based approach championed by John Wade"); Henderson and Twerski, *Achieving Consensus on Defective Product Design*, 83 Cornell L.Rev. at 879 ("Dean Prosser, the Reporter responsible for drafting section 402A, writing some seven years after its promulgation, made it clear that the standard for both design and failure-to-warn defects sounds in classic negligence."); Thomas, *Defining "Design Defect" in Pennsylvania*, 71 Temp. L.Rev. at 233–34 ("[C]ost-benefit analysis lies at the core of the negligence analysis, just as it lies at the core of the defect analysis."); William A. Worthington, *The "Citadel" Revisited: Strict Tort Liability and the Policy of Law*, 36 S. Tex. L.Rev. 227, 270 (1995) ("The risk-utility test, which requires a balancing of design considerations, is inevitably a fault-based test, and although it fails to provide explicitly any objective standard of conduct, the reasonable and prudent manufacturer is implicit."); John W. Wade, *Strict Tort Liability of Manufacturers*, 19 Sw. L.J. 5, 15 (1965) ("It may be argued that [the 'unreasonably dangerous' dynamic of Section 402A] is simply a test of negligence. Exactly."). *See generally Griggs*, 981 F.2d at 1429 (describing the classic role of risk-utility balancing in negligence law). *Compare Dambacher*, 336 Pa.Super. at 50–51 n. 5, 485 A.2d at 423 n. 5 (referencing various strict liability risk-utility factors), *with* Restatement (Second) of Torts §§ 291–93 (1965) (negligence risk-utility factors).

As justification for its adherence to the position that negligence concepts have no place in strict liability, the lead opinion indicates that "[s]trict liability focuses solely on the product, and is divorced from the conduct of the manufacturer." Opinion, at 656. But, while this was a common aphorism in the developmental stages of strict liability doctrine, and the lead Justices are not alone in perpetuating it, most courts and commentators have come to realize that in design cases the character of the product and the conduct of the manufacturer are largely inseparable. For example, one pair of commentators has explained:

> One of the most frequently repeated distinctions is that even though both [negligence and strict liability] risk/utility tests focus on reasonableness, strict liability focuses on the reasonableness of the product, whereas negligence focuses on the reasonableness of the seller. In theory a product manufacturer could act reasonably in designing a product, but its product could nevertheless be unreasonably dangerous. Perhaps, however, the key words in this formulation are "in theory." In practice, manufacturers consciously choose how to design their products. Asking whether the product is reasonable tends to circle back to asking whether the manufacturer used due care in designing it. The effort at distinguishing between reasonable products and reasonable manufacturers may be more of a weak excuse for articulating two tests than a true justification.

Cupp and Polage, *The Rhetoric of Strict Products Liability Versus Negligence*, 77 N.Y.U.L. REV. at 893 (footnotes omitted). This point is made more forcefully by the Reporters for the new Restatement:

> [T]o condemn a design for being unreasonably dangerous is inescapably to condemn the designer for having been negligent. To insist otherwise would be akin to a professor telling a law student that, while the brief the student wrote is awful, the professor is not passing judgment on the student's skill in writing it. Similarly, ... insistence that strict liability is somehow being imposed if the court assess-

es the reasonableness of the design and not the reasonableness of the designer's conduct is purest sophistry.

Henderson and Twerski, *Achieving Consensus on Defective Product Design,* 83 CORNELL L.REV. at 919; *see also* Wade, *Strict Tort Liability of Manufacturers,* 19 Sw. L.J. at 15. *See generally Duchess,* 564 Pa. at 546–47, 769 A.2d at 1141–42 (citing cases).

The concern, expressed by the lead Justices here, with the purity of strict liability theory has been previously addressed, for example, by Dean Wade. *See, e.g.,* Wade, *On the Nature of Strict Tort Liability for Products,* 44 MISS. L.J. at 835 ("A possible initial impression is that [express recognition of the role of negligence concepts in strict products liability theory] is rank apostasy, amounting to an abandonment of the strict-liability concept and a return to the negligence concept will be seen as erroneous on analysis"). Dean Wade's answer, however, was not to perpetuate a fiction, but rather, to acknowledge that the strict liability dynamic pertains to the plaintiff's burden of establishing due care in the manufacture/supply process; whereas, concepts derived from negligence theory serve a critical role at other stages (or in other aspects) of the liability assessment. *See, e.g., id.* at 834–35; *see also* Wade, *Strict Tort Liability of Manufacturers,* 19 Sw. L.J. at 15; *accord* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 1 cmt. a (1998) (" '[S]trict products liability' is a term of art that reflects the judgment that products liability is a discrete area of tort law which borrows from both negligence and warranty.").

I believe that the time has come for this Court, in the manner of so many other jurisdictions, to expressly recognize the essential role of risk-utility balancing, a concept derived from negligence doctrine, in design defect litigation. In doing so, the Court should candidly address the ramifications, in particular, the overt, necessary, and proper incorporation of aspects of negligence theory into the equation. This Commonwealth's products liability jurisprudence is far too confusing for another opinion to be laid down that rhetorically eschews negligence concepts in the strict liability arena, while the

Court nevertheless continues to abide and/or endorse their actual use in the liability assessment. *Cf. Surace,* 111 F.3d at 1046 ("We regret that the [Pennsylvania] Supreme Court has not yet spoken definitively on the matter of risk-utility analysis or its component factors.").

## II. Several ambiguities and inconsistencies in the prevailing Pennsylvania strict products liability jurisprudence affect proper resolution of the question framed in this appeal.

A primary legal question framed by this appeal is whether strict products liability doctrine requires that a plaintiff's injuries or loss be sustained during a product's use by an "intended user," or merely in the course of a use that was reasonably foreseeable to the manufacturer or supplier. Since I do not agree with the lead Justices that this question can be resolved by the rhetorical exclusion of negligence concepts from strict liability doctrine, I believe that a more searching examination of the doctrine is necessary.

Substantively, Pennsylvania's acceptance of risk-utility (or cost-benefit) balancing places it "very much in the mainstream of modern products liability law." Thomas, *Defining "Design Defect" in Pennsylvania,* 71 TEMP. L.REV. at 218; *see also id.* at 222 ("There is widespread agreement among courts and scholars today that the cost-benefit balancing test is the appropriate test for design defect.").[7] There are several ambiguities and inconsistencies in Pennsylvania's procedure, however, which render our law idiosyncratic. *See* Henderson and Twerski, *Achieving Consensus on Defective Product Design,* 83 CORNELL L.REV. at 897 ("Pennsylvania has, by common agreement, developed a unique and, at times, almost unfathomable approach to products litigation."). First, in the attempt to insulate the jury from consideration of any terminology derived from or related to negligence theory, the Court

---

**7.** A competing framework, known as the consumer expectations test, has come to be widely regarded as inadequate in and of itself, fairly sustainable only as one component of cost-benefit balancing. *See generally* Cupp and Polage, *The Rhetoric of Strict Products Liability Versus Negligence,* 77 N.Y.U. L.REV at 889–92.

has effectively relegated the core decisional aspect of strict liability cases (risk-utility balancing) to the trial judge in a role described by the Superior Court as "a social philosopher and a risk-utility economic analyst." *See, e.g., Fitzpatrick v. Madonna,* 424 Pa.Super. 473, 476, 623 A.2d 322, 324 (1993).[8] *See generally* Henderson and Twerski, *Achieving Consensus on Defective Product Design,* 83 CORNELL L.REV. at 897 ("Pennsylvania stands alone in its view that risk-utility balancing is never properly a jury function."). At the same time, the Court has maintained that it is the jury's function to resolve questions concerning the condition of the product and the truth of the plaintiffs' factual averments. *See Azzarello,* 480 Pa. at 556–58, 391 A.2d at 1025–26. The efforts of trial and intermediate appellate courts to reconcile these directives has led to risk-utility balancing by trial courts on the facts most favorable to the plaintiff (to avoid entangling the trial judge in determining the factual questions assigned by *Azzarello* to the jury), *see, e.g., Fitzpatrick,* 424 Pa.Super. at 475, 623 A.2d at 324, and minimalistic jury instructions (to insulate the jury from negligence terminology), which lack essential guidance concerning the nature of the central conception of product defect.[9]

With regard to the role of the trial court, the concern is summarized in commentary as follows:

8. Negligence doctrine also places the trial court in the role of determining duty; however, this entails the broader assessment of whether a duty of care is owed in general, *see generally Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000), not the specifics of how the duty must be implemented in individualized circumstances and, correspondingly, when the duty is breached. Such fact-based determinations are inherently the function of the jury.

9. *Azzarello* endorsed the following suggested jury instruction:

The (supplier) of a product is the guarantor of its safety. The product must, therefore, be provided with every element necessary to make it safe for (its intended) use, and without any condition that makes it unsafe for (its intended) use. If you find that the product, at the time it left the defendant's control, lacked any element necessary to make it safe for (its intended) use or contained any condition that made it unsafe for (its intended) use, then the product was defective, and the defendant is liable for all harm caused by such defect.

*Azzarello,* 480 Pa. at 560 n. 12, 391 A.2d at 1027 n. 12; *see also* PA. SUGGESTED STANDARD JURY INSTRUCTIONS 8.02 (PBI Press 1997).

[I]f the court is required to view the evidence on the cost-benefit factors in the light most favorable to the plaintiff, and if (as most scholars and some courts have concluded) the *Azzarello* instruction does not permit the jury to consider cost-benefit factors at all, then neither the court nor the jury has the authority to actually decide whether the true benefits of the proposed alternative design outweigh the true costs. In other words, under this view of the division of decisional power, neither the court nor the jury determines whether the product is in fact unreasonably dangerous or defective.

... [T]he fundamental issue of whether the incremental societal benefits of the proposed alternative design outweigh the incremental societal costs remains forever in a sort of legal limbo; trial courts are permitted to decide only whether the evidence is sufficient to submit that issue to the jury, but they are prohibited from actually submitting it.

Thomas, *Defining "Design Defect" in Pennsylvania,* 71 TEMP. L.REV. at 232.

With regard to the sufficiency of the jury charge, Dean Wade afforded the following perspective to the central conception of product defect:

[T]he term "defective" raises many difficulties. Its natural application would be limited to the situation in which something went wrong in the manufacturing process, so that the article was defective in the sense that the manufacturer had not intended it to be in that condition. To apply it also to the case in which a warning is not attached to the chattel or the design turns out to be a bad one or the product is likely to be injurious in its normal condition, is to use the term in a Pickwickian sense, with a special, esoteric meaning of its own. It is not without reason that some people, in writing about it, speak of the requirement of being "legally defective," including the quotation marks. To have to define the term to the jury, with a meaning completely different from the one they would normally give to it, is to create the chance that they will be misled. To use it without defining it to the jury is almost to ensure that they will be mis-

led.... Finally, the term "defective" gives an illusion of certainty by suggesting a word with a purported specific meaning rather than a term connoting a standard involving the weighing of factors.

Wade, *On the Nature of Strict Tort Liability for Products*, 44 MISS. L.J. at 831–32 (footnote omitted).[10]

It is by way of reference to the state of our law as reflected above that I would answer the question concerning whether design-defect, strict products liability doctrine should be limited according to an intended user concept. While recognizing that integration of the "reasonably foreseeable use" alternative into strict products liability doctrine may reflect the greater consensus and better reasoned view,[11] in the landscape

**10.** Professor John M. Thomas states the concern specific to Pennsylvania law as follows:

> To be sure, the *Azzarello* instruction successfully avoids negligence terminology. It does not, however, "clearly and concisely" express the concept of "defect," because it fails to instruct the jury how to determine whether a product is "safe" or "unsafe" for its intended use. Obviously, the court could not have meant "safe" to mean incapable of causing injury, both because every product is capable of causing injury under some circumstances, and because such a meaning would create exactly the type of automatic liability that the court said the law must preclude. Yet, the instruction contains no language that effectively serves the same "critical" function as the unreasonably dangerous requirement under section 402A or the cost-benefit instructions approved in *Barker [v. Lull Eng'g Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978)]. That is, nothing in the instruction explicitly ensures that the manufacturer will not be held liable as an insurer and therefore will not automatically be liable for all injuries resulting from the product's use. To the contrary, the *Azzarello* instruction affirmatively states that the manufacturer is the "guarantor" of the product's safety, a term that to a lay jury will surely seem indistinguishable from "insurer."

Thomas, *Defining "Design Defect" in Pennsylvania*, 71 TEMP. L.REV. at 225.

**11.** *See, e.g.,* 1 PROD LIAB.: DESIGN AND MFG. DEFECTS § 3.5 (2d ed. 2002) ("Misuse of the product must be anticipated by the manufacturer[;][f]orseeable misuses of a product will not absolve the manufacturer."). On this point, Dean Wade explained:

> Some courts have spoken of the intended use of the product. And the intent is sometimes restricted to that of the manufacturer, thus affording him the opportunity to limit the scope of his liability. Once again, this sounds more like an action for breach of contract than a tort action. In substitution for the term "intended use," other

of our law as it presently exists, I must agree with the majority's holding that the narrowest category of cases should be subjected to such a liability scheme.[12] I believe, however, that the above summation of Pennsylvania law demonstrates a compelling need for consideration of reasoned alternatives, such as are reflected in the position of the Third Restatement.

## III. The Restatement's considered approach illuminates the most viable route to providing essential clarification and remediation.

Section 2 of the newest Restatement catalogues the traditional three categories of product defect: manufacturing defects, design defects, and defects arising from inadequate warnings or instructions. *Compare* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(a)-(c), *with supra* note 1. Manufacturing defects are discerned according to a fairly straightforward test: they are deemed present when a product fails to conform to its intended design, and liability is imposed regard-

adjectives may be used—expected, anticipated, normal, foreseeable; note how they became broader in their scope. For an action based upon negligence it would seem that a manufacturer should be held to the duty of seeking to make his product duly safe for uses which might be reasonably foreseen. Of course, it may be argued that for strict liability, which is imposed on an objective basis without having to find negligent conduct, a narrower scope as to the nature of the use may be appropriate. The other view seems better, and reference may be made again to the suggested standard of what a reasonable prudent man would do, assuming that he had knowledge of the dangerous condition of the chattel.

Wade, *On the Nature of Strict Tort Liability for Products*, 44 MISS. L.J. at 847 (footnotes omitted).

12. Again, Dean Wade's commentary remains highly relevant in adding perspective:

It is appropriate to remark here that a court which seeks to impose liability for any product which is unsafe, without consideration of whether that lack of safety is due or reasonable, will find other means of controlling the extent of the liability. One of the ways of doing this is to speak of proximate cause or to limit the scope of the risk on the basis of a more restricted type of use to which the liability will extend. It seems much better to bring the policy elements out into the open by giving consideration to the factors to be weighed in determining whether the product is duly safe.

Wade, *On the Nature of Strict Tort Liability for Products*, 44 MISS. L.J. at 847.

less of whether or not the manufacturer's quality control efforts satisfy reasonableness standards. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(a) & cmt. a. The Restatement thus retains classic strict products liability for the category of defects that the doctrine was concerned with when it initially evolved. *See supra* notes 1–3 and accompanying text.

By contrast, however, the Restatement's conception of defective design is more nuanced, to accommodate the wider range of scenarios that may face injured consumers and manufacturers/suppliers. As a general rule, a product is deemed defective in design when the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design, and when the failure to utilize such a design has caused the product to be "not reasonably safe." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2(b).[13] The Reporters explain the need for such a negligence-based standard in such "classic design cases" as follows:

> In contrast to manufacturing defects, design defects … are predicated on a different concept of responsibility. In the first place, such defects cannot be determined by reference to the manufacturer's own design or marketing standards because those standards are the very ones that plaintiffs attack as unreasonable. Some sort of independent assessment of advantages and disadvantages, to which some at-

---

13. In other scenarios contemplated by the newest Restatement, an inference of defective design may attach where a product fails to perform safely its manifestly intended function. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. b, § 3. The Restatement's Section 4, concerning violations of statutory and regulatory safety standards, also facilitates determinations of defective design in another discrete category of cases. *See id.* § 4. Further, the Restatement addresses special products and product markets to which the general standard in subsection 2(b) may not apply. *See id.* §§ 5–8. *See generally* Henderson and Twerski, *Achieving Consensus on Defective Product Design,* 83 CORNELL L.REV. at 905–07 (detailing the Third Restatement's approach). Finally, the Restatement acknowledges the possibility of manifest unreasonableness of a product, despite lack of an alternative, safer design. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. e. The special categories of design defect theory function, *inter alia,* to alleviate the plaintiff's burden of proof in appropriate circumstances.

tach the label "risk-utility balancing" is necessary. Products are not generically defective merely because they are dangerous. Many product-related accident costs can be eliminated only by excessively sacrificing product features that make products useful and desirable. Thus, the various trade-offs need to be considered in determining whether accident costs are more fairly and efficiently borne by accident victims, on the one hand, or, on the other hand, by consumers generally through the mechanism of higher product prices attributable to liability costs imposed by courts on product sellers.

*Id.* § 2 cmt. a.[14] The Restatement also roundly endorses a reasonableness-based, risk-utility balancing test as the standard for adjudging the defectiveness of product designs. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. d. *See generally* Conk, *Is There a Design Defect in the Restatement (Third) of Torts*, 109 YALE L.J. at 1132–33 ("The Restatement (Third) correctly restates the law of products liability in the alternative-safer-design test of section 2(b). In design-defect cases, it is generally a negligence standard, not a strict-liability rule, that determines whether a product is de-

---

**14.** The Reporters also describe the essential role of evidence of an alternative safer design in classic design cases as follows:

Common and widely distributed products such as alcoholic beverages, firearms, and above-ground swimming pools may be found to be defective [in design] only upon proof of [a reasonable alternative design].... Absent [such proof], however, courts have not imposed liability for categories of products that are generally available and widely used and consumed, even if they pose substantial risks of harm. Instead, courts generally have concluded that legislatures and administrative agencies can, more appropriately than courts, consider the desirability of commercial distribution of some categories of widely used and consumed, but nevertheless dangerous, products. RESTATEMENT (THIRD) OF TORTS· PRODUCTS LIABILITY § 2 cmt. d; *see also* Conk, *Is There a Design Defect in the Restatement (Third) of Torts*, 109 YALE L.J. at 1088 ("The 'alternative-safer-design' rule enshrined in section 2 of the Restatement (Third) is the vindication of [Dean] Wade's view that design-defect litigation should turn on whether the product could have and should have been made safer before it was sold."); *cf.* Thomas, *Defining "Design Defect" in Pennsylvania*, 71 TEMP L.REV at 230 ("*Azzarello* and its progeny also support, almost uniformly, the Restatement's requirement that plaintiffs prove a reasonable alternative design as part of their *prima facie* case.").

fective. That fault-based standard [represents] the distilled expression of thirty years of design-defect litigation...."). The Restatement also indicates that the cost-benefit test will be applied by the jury, guided by appropriate instructions, where sufficient evidence has been presented to preclude summary judgment or a directed verdict. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. f.

Additionally, and of particular interest in this case, the Reporters propose that liability standards reject the "open and obvious" or "patent danger" rule as a total bar to a design defect claim, relegating "obviousness" to the role of "one factor among many to consider as to whether a product design meets risk-utility norms." *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. d. One commentator forecast the effect of the Restatement as follows:

> [T]he Restatement (Third) of Torts: Products Liability may be anticipated to provide theories of recovery and systems of proof and defense that neutralize most of the harsh effects of the consumer expectations test and the open and obvious defense. In their stead the Reporters promote exclusive resort to a risk-utility evaluation, fortified by concepts of reasonable foreseeability, which increases the likelihood of liability for manufacturers who put into household use products nominally intended for adults, but which foreseeably invite misadventure with children.

M. Stuart Madden, *Products Liability, Products for Use by Adults, and Injured Children: Back to the Future*, 61 TENN. L.REV. 1205, 1240 (1994). The new Restatement also recognizes that there are scenarios in which a design duty may persist, despite the affordance by the manufacturer of an express warning. *See* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. l; *accord Price v. BIC Corp.*, 142 N.H. 386, 702 A.2d 330, 333 (1997) ("[W]hen an unreasonable danger could have been eliminated without excessive cost or loss of product efficiency, liability may attach even though the danger was obvious or there was adequate warning." (quoting *LeBlanc v. American Honda Motor Co.*, 141 N.H. 579, 688 A.2d 556, 562 (1997))). *See generally* James A. Henderson, Jr. and

Aaron D. Twerski, *The Products Liability Restatement in the Courts: An Initial Assessment,* 27 Wm. Mitchell L.Rev. 7 (2000).

In my view, adoption of the Restatement's closely reasoned and balanced approach, which synthesizes the body of products liability law into a readily accessible formulation based on the accumulated wisdom from thirty years of experience, represents the clearest path to reconciling the difficulties persisting in Pennsylvania law, while enhancing fairness and efficacy in the liability scheme.[15]

## IV. Either under the Restatement Third or traditional negligence theory, the Phillips' claims should survive the present summary judgment effort.

Appellants' arguments in support of the trial court's grant of summary judgment are constructed primarily on the intended user, simple tools, and open and obvious doctrines. As the lead correctly notes, a reasonably foreseeable use, as opposed to intended user framework, applies in the negligence setting. Nevertheless, in child-play fire cases, some courts have accepted arguments akin to Appellants' as controlling, although the various theories advanced by plaintiffs and reasons adopted by the courts make it difficult to generalize.[16] Other courts have

**15.** It should be noted that the Restatement does not take a position concerning the appropriate jury instruction in design defect cases. *See* Restatement (Third) of Torts: Products Liability § 2 cmt. d. It would not be difficult, however, to synthesize an appropriate approach to the jury charge from those used by other jurisdictions and advocated in the commentary. *See, e.g.,* Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. at 839–41; Thomas, *Defining "Design Defect" in Pennsylvania,* 71 Temp. L.Rev. at 240–41.

**16.** *See, e.g., Jennings v. BIC Corp.,* 181 F.3d 1250, 1258 (11th Cir.1999) ("Under Florida law, ... BIC was not required to child-proof its lighters to satisfy its duty of reasonable care."); *Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1407 (7th Cir.1994); *Kirk v. Hanes Corp. of N.C.,* 16 F.3d 705, 711 (6th Cir.1994) ("The public policy of Michigan ... provides that the primary responsibility for safeguarding children from the obvious and inherent dangers associated with the hundreds of simple tools with which we surround ourselves rests with the *parents* of these children and not the *manufacturer* of the simple tool." (emphasis in original)); *Sedlock ex rel. Sedlock v. Bic Corp.,* 741 F.Supp. 175, 177 (W.D.Mo.1990) ("Missouri law explicitly holds that manufacturers are

concluded that the matter should be determined by risk-utility balancing, and thus, may be properly submitted to a jury.[17] *See generally* Annotation, *Products Liability: Lighters and Lighter Fluid,* 14 A.L.R.5th 47 (Lawyers Cooperative Publishing 1993 & West Group Supp.2002).

The tension in these cases is obvious. On the one hand, concepts of parental responsibility and known and open childhood risks disfavor reallocation of loss.[18] Nevertheless, some

not liable for failure to make adult products child proof."); *Boumelhem v. Bic Corp.,* 211 Mich.App. 175, 535 N.W.2d 574, 576–77 (1995) (following Michigan precedent to conclude that a manufacturer owed no duty to design a child-resistant lighter, utilizing a "simple tool" analysis); *Curtis ex rel. Curtis v. Universal Match Corp.,* 778 F.Supp. 1421, 1425 (E.D.Tenn.1991) (holding, under Tennessee law, that a disposable lighter is not unreasonably dangerous because the "ordinary adult consumer" understood and appreciated the danger posed by children's use of lighters).

**17.** *See, e.g., Griggs,* 981 F.2d at 1439 (applying, under Pennsylvania negligence law, a risk-utility analysis and holding that a viable design liability claim could result from a manufacturer's failure to make a lighter child resistant); *Hittle,* 166 F.Supp.2d at 159 (following *Griggs* in relation to an "Aim 'N Flame" lighter); *Price,* 702 A.2d at 333 (opining, in a disposable lighter case, that "barring a determination that the utility of the product completely outweighs the risk associated with its use or that the risk of harm is so remote as to be negligible, the legal representative of a minor child injured as a result of the misuse of a product by another minor child can maintain a defective design product liability claim against the product's manufacturer, even though the product was intended to be used only by adults, when the risk that children might misuse the product was open and obvious to the product's manufacturer and its intended users."); *Bean v. BIC Corp.,* 597 So.2d 1350, 1352 (Ala.1992) (concluding, under a consumer expectations test, that manufacturers owe consumers a duty to make lighters child resistant, because the court was unwilling to make "the sweeping and decisive pronouncement that a manufacturer of a product that it intends to be used by adults never has a duty to make the product safer by making it child-resistant when the dangers are foreseeable and prevention of the danger is feasible"); *Campbell v. BIC Corp.,* 154 Misc.2d 976, 586 N.Y.S.2d 871, 873 (N.Y.Sup.Ct.1992) ("Because the lighters manufactured by defendant are commonly used and kept about the home, it is reasonably foreseeable that children will have access to them and will try to use them[;][t]hus, the court finds that defendant did owe plaintiff a duty of care."); *id.* ("Nor does defendant's invocation of the 'open and obvious' doctrine [control,] because in New York that is simply another factor that is considered in determining the reasonable care exercised by the partie[s.]").

**18.** Professor M. Stuart Madden summarized this point as follows:

of the policies underlying tort law loss reallocation are implicated in the disposable lighter cases, which involve a specific type of household, simple tool that may be particularly destructive and may be reasonably capable of safer design. *See generally* Jerry J. Phillips, *Products Liability for Personal Injury to Minors,* 56 VA. L.REV. 1223, 1240–41 (1970) ("[E]ven the best of educational efforts cannot be expected to change the essential nature of children, and, unless we are prepared to ignore this fact, in many instances better product design presents the only realistic means available for protecting children against injury.").

On balance, I agree that the above considerations are best assessed by a factfinder in a risk-utility equation. Thus, on the arguments presented in Appellants' summary judgment motion and properly before this Court,[19] I join the majority in its decision to refrain from precluding child resistance as a

Concededly, some childhood injuries require the conclusion that the cost and other burdens of the injury should remain with the injured child and not shift to the manufacturer, seller, or other third party. For example, childhood misuse may break the causal connection between a manufacturer's design or warning and the injury when the appearance or promotion of the product does not by itself attract the risky behavior. A few commonplace products are unlikely to trigger liability in the absence of some bizarre or malevolent concatenation of events. As one court stated:

Toothpicks like pencils, pins, needles, knives, razor blades, nails, tools of most kinds, bottles and other objects made of glass, present obvious dangers to users, but they are not unreasonably dangerous, in part because the very obviousness of the danger puts the user on notice. It is part of normal upbringing that one learns in childhood to cope with the dangers posed by such useful everyday items. It is foreseeable that some will be careless in using such items and will be injured, but the policy of our law in such cases is not to shift the loss from the careless user to a blameless manufacturer or supplier.

M. Stuart Madden, *Products Liability, Products for Use by Adults, and Injured Children,* 61 TENN. L.REV at 1210–11 (footnotes omitted).

**19.** Various *amici* suggest that state tort law may be preempted based on regulatory involvement of the national Consumer Product Safety Commission, and, in particular, regulations permitting the sale of certain, stockpiled disposable lighters not meeting specified child resistance criteria. *See* Safety Standards for Cigarette Lighters, 16 C.F.R. §§ 1210.1, 1210.4 (2001). Such an argument, however, was not advanced in Appellants' summary judgment motion, and therefore, is not presently before the Court.

design obligation in terms of this particular type of household product known to be diverted to child play. I also believe that this view squares with the approach advanced in the Restatement Third.

Justices CASTILLE and EAKIN join this concurring opinion.

### CONCURRING AND DISSENTING OPINION

Justice NEWMAN.

As the majority opinion observes, the facts of this case are tragic. A family was decimated when two-year-old Jerome Campbell ignited bed linens with a Cricket lighter he had found in his mother's (Robyn Williams) pocketbook, which she had placed on top of a refrigerator. Neil, the five-year-old brother of Jerome, saw him use the lighter and tried several times to awaken their mother. He could not do so. A neighbor rescued Neil; but Jerome, Robyn, and another one of her children died in the ensuing blaze.

Gwendolyn Phillips, as administratrix of the estates, and as guardian of Neil ("Appellee"), sued the manufacturers and distributors of the Cricket lighter ("Appellants") and demanded that they pay damages to compensate Appellee for pain and suffering and loss of life. Appellee asserts that the doctrines of strict product liability and negligence provide a basis for recovery against Appellants for failing to have child-safety devices on the lighters.

One cannot help but feel compassion for this family. Compassion, however, can be a blind guide. The majority correctly ruled that concepts of negligence have no place in a strict products liability case and held that the Appellee's strict liability claim must fail because the lighter was not unreasonably dangerous when used by adults, the class of intended users. As one court explained:

Cigarette lighters are intended to be used to set fire to things that are intended to be burned: cigarettes, cigars, candles, etc. They are not intended to be used as children's

playthings. Indeed, the packaging of [the lighter at issue in that case] ... bears the warning: "Keep out of reach of children." Since use of a lighter as a children's plaything was not its intended use, the manufacturer is not strictly liable for injuries incurred when it is so used, even if such use was reasonably foreseeable by [the manufacturer].

*Jennings v. BIC Corp.*, 181 F.3d 1250, 1256 (11th Cir.1999). Accordingly, the majority properly rejected the strict liability claims in this case because the lighter was safe for its intended use by adults.

However, I respectfully disagree with the majority because I do not believe that we should allow the negligence causes of action to remain. Instead, this Court should have reinstated the Order of the trial court granting summary judgment to Appellants on Appellee's causes of action sounding in negligence. Fundamentally, I base this conclusion on my belief that the law of negligence simply does not require Appellants to pay damages for placing into the stream of commerce an object that was reasonably safe for its intended use and, in fact, operated as intended.

Though I agree with the majority that Appellants had a duty to the mother, they fulfilled that duty by creating a lighter that was reasonably safe for its intended use. Appellants had a duty to manufacture a lighter that did not explode, leak fluid, or get unreasonably hot. They could not escape liability if their negligence caused the lighter to spontaneously spark or ignite when left unattended. However, the law of negligence does not establish a duty to make the lighter safe for the use of a two-year-old child. Similarly absent are any applicable statutory requirements that the lighter at issue bear a child-safety device. Although the United States Consumer Product Safety Commission promulgated regulations requiring that lighters subject to the provision "be resistant to successful operation by at least 85 percent" of the children tested, 16 C.F.R. § 1210.3, the lighter involved in the instant fire was manufactured before the July 12, 1994 effective date

of the regulations, 16 C.F.R. § 1210.1.[1] Consequently, there are no regulations that create a duty to make the lighter safe for the use of the child in this case.

We do not require knife manufacturers to make knives safe for our children. We do not require the makers of matches to place them in special safety-boxes; we do not require drill makers or electric saw makers to have child safety locks; and we should not require lighters to be made safe for children.

> Were we to hold otherwise, the principle that we would have to adopt would permit virtually every manufacturer of a household tool or appliance to be found negligent. Knives, guns, blenders, saws, drills: the list of helpful tools perfectly safe in adult hands but dangerous in the hands of unsupervised children is endless.

*Kirk v. Hanes Corp. of N.C.*, 16 F.3d 705, 710 (6th Cir.1994) (quoting *Byler v. Scripto–Tokai Corp.*, 1991 WL 181749 at *6, 1991 U.S.App. Lexis 22277 at *17 (6th Cir.1991) (unpublished)).

As parents, we recognize that we cannot safeguard our children from all the dangers of the world. We take reasonable action to protect them, but when those actions fail, we cannot blame others for our own lack of attention or for the dangers of the world in general. Lighters are potentially dangerous products. They are not to be used by children.

Manufacturers, distributors, and sellers have a duty to provide products that are not unreasonably dangerous when operated as intended by their intended users. They also have the duty to warn us of the dangers inherent in the proper operation of the product and to tell us, what we all know, that certain products should be kept away from children. They do not have a duty to make sure that a reasonably safe product, when used as intended, be safe when used by a two-year-old child. That is an unreasonable burden, which I would decline to impose on industry.

1. According to the Superior Court, the lighter was manufactured in 1990, four years before the effective date of the regulation. *Phillips v. Cricket Lighters*, 773 A.2d 802, 807 (Pa.Super.2001).

I am sympathetic to efforts to encourage lighter manufacturers to place child safety devices on lighters. However, neither the law of negligence, nor any applicable regulatory or statutory provision required Appellants to do so.

Therefore, I respectfully dissent. I would reverse the determination of the Superior Court and reaffirm the Order of the trial court granting Appellants' motion for summary judgment and dismissing the claims of Appellee.[2]

**2.** As to the punitive damages claim, because I believe that Appellants did not breach a duty to the mother or the children, there is no conceivable wanton behavior or willful misconduct to form the basis of a punitive damages claim. Accordingly, I would dismiss it as well.