**Wayne BERRIER, et al.**

v.

**SIMPLICITY CORPORATION**

No. CIV.A. 04–CV–97–LDD.

United States District Court,
E.D. Pennsylvania.

June 29, 2005.

Alan Feldman, Daniel J. Mann, Feldman, Shepherd, Wohlgelernter & Tanne, Philadelphia, PA, for Plaintiffs.

434

Donald H. Carlson, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, James M. Brogan, Dla Piper Rudnick Gray Cary US, LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM OPINION

DAVIS, District Judge.

Wayne Berrier and Brenda Gregg ("plaintiffs"), on behalf of Ashley Berrier ("Ashley"), a minor, assert negligence and strict liability claims for damages against the defendant/third-party plaintiff, Simplicity Manufacturing, Inc. ("Simplicity"), for injuries Ashley received by virtue of an allegedly defective riding lawn mower (the "mower") manufactured by Simplicity. At the time of the accident, the mower was being operated by Melvin Shoff ("Mr. Shoff"), Ashley's grandfather. Simplicity has asserted a contribution claim against Mr. Shoff and his wife, Mrs. Shoff (collectively referred to as "third-party defendants"), alleging among other theories of negligence that they failed to supervise Ashley.

Presently before the Court is Simplicity's motion for summary judgment on plaintiffs' negligent design and strict product liability claims (Doc. No. 33); plaintiffs' brief in opposition to Simplicity's motion for summary judgment (Doc. No. 40); third-party defendants' brief in opposition to Simplicity's motion for summary judgment (Doc. No. 37); and Simplicity's reply briefs thereto (Doc. No. 48–49). Also before this Court is third-party defendants' motion for partial summary judgment (Doc. No. 32); Simplicity's brief in opposition to third-party defendants' motion for partial summary judgment (Doc. No. 34); and third-party defendants' response thereto (Doc. No. 39).

For the following reasons, this Court grants Simplicity's motion for summary judgment on Counts I and II of plaintiffs' complaint; denies third-party defendants' motion for summary judgment on the negligent supervision allegations; and grants third-party defendants' motion for summary judgment on the failure to instruct allegation against Mrs. Shoff.

## I. Background

Mr. Shoff purchased the mower from a Simplicity dealer in Honey Brook, Pennsylvania, in 1994 or 1995, eight or nine years before the accident. (See Mr. Shoff's Dep., attached as Ex. A to Def. Br., at 13–14). The mower was designed between 1991 and 1994, and assembled in 1994. (See Simplicity's Response to Pl. Interrogatories, attached as Ex. B to Def. Br., at No. 2). Simplicity manufactured the mower on October 19, 1994. (Id.).

### A. Structure of the Mower

The mower contains a 36″ steel mower deck enclosing two rotating mower blades. (See Pictures of Mower, attached as Ex. C to Def. Br., at Nos. 2, 18, 29). The deck is positioned between the front and rear wheels, surrounding the perimeter of the blades. (Id., at Nos. 29, 30, 31). The operator enjoys control both over the engagement of the mower blades, which may be activated through a power take-off lever on the left side of the dashboard, and over the speed and direction of the tractor. (Id., at Nos. 2–5, 20, 26; see Operator's Manual, attached as Ex. D to Def. Br., at 6, 10). No physical barriers impede the vision of the operator from the seat located in the rear of the mower. (See Mr. Shoff's Dep., at 91–82; see Pictures, at Nos. 2–5).

Simplicity equipped the mower with three electrical safety systems. First, an interlock system prevents the engine from starting unless the transmission and blade controls are in stopped positions. (See Operator's Manual, at 7). Second, an op-

erator presence control system automatically stops the engine and blades if the operator leaves the seat without first stopping the blades. (*Id.*). Third, an operator presence control system automatically stops the engine if the operator leaves the seat without first setting the parking brake. (*Id.*).

The mower was not equipped with a control system that prevents an operator from engaging the mower blades in reverse.

## B. Product Warnings

The mower contained several warnings and instructions located at the operator's position on the machine, highlighted by the word **"WARNING"** (the "on-product warnings"). These on-product warnings were preceded by the caption **"AVOID SERIOUS INJURY OR DEATH,"** and included, *inter alia,* the following: "Look Down And Behind Before And While Backing"; "Do Not Mow When Children or Others Are Around"; "Read Operator's Manual"; and "Be Sure Blade(s) And Engine Are Stopped Before Placing Hands Or Feet Near Blade(s)". (*See* Pictures, at No. 16).

The Operator's Manual also contained a section entitled **"Safety Rules,"** which, in turn, articulated principles of general operation and rules that concerned children (the "in-manual warnings"). The Operator's Manual stated that the failure to follow these rules "could result in loss of control of rider, severe personal injury or death to you, or bystanders, or damage to property or equipment." (*See* Operator's Manual, at 3). It further stated that compliance with the prescribed safety rules was particularly important because the "mowing deck is capable of amputating hands and feet and throwing objects." (*Id.*).

The Operator's Manual included, *inter alia,* the following rules with respect to the general operation of the mower:

### GENERAL OPERATION

● Read, understand, and follow all instructions in the manual and on the unit before starting.

● Only allow responsible adults, who are familiar with the instructions, to operate the unit.

● Clear the area of objects such as rocks, toys, wire, etc., which could be picked up and thrown by the blade(s).

● Be sure the area is clear of other people before mowing. Stop unit if anyone enters the area.

● Never carry passengers.

● Do not mow in reverse unless absolutely necessary. Always look down and behind before and while traveling in reverse.

(*See* Operator's Manual, at 3).

The Operator's Manual provided the following rules with respect to children:

### CHILDREN

● Tragic accidents can occur if the operator is not alert to the presence of children. Children are often attracted to the unit and the mowing activity. Never assume that children will remain where you last saw them.

● Keep children out of the mowing area and under the watchful care of another responsible adult.

● Be alert and turn unit off it children enter the area.

● Before and when backing, look behind and down for small children.

● Never carry children. They may fall off and be seriously injured or interfere with the safe unit operation.

● Never allow children to operate the unit.

• Use extra care when approaching blind corners, shrubs, trees, or other objects that may obscure vision.

(*See* Operator's Manual, at 4).

## C. Accident

An understanding of the factual circumstances leading up to the accident comes from three sources: (i) Mrs. Shoff's deposition; (ii) Mr. Shoff's deposition; and (iii) Mr. Shoff's statement to the insurance company on May 9, 2003.

### 1. Deposition Testimony

On May 7, 2003, Mr. Shoff's daughter dropped plaintiff off at the Shoffs' home. (*See* Mr. Shoff Dep., attached as Ex. A to Def. Br., at 38). Later that afternoon, Mr. Shoff decided to mow his lawn. (*Id.*, at 40). At the time, plaintiff was sitting on a couch watching television and Mrs. Shoff was in the kitchen. (*Id.*, at 37–38; 39–40; *see* Mrs. Shoff Dep., attached as Ex. F, at 33). Mr. Shoff announced to his wife that he was going to cut the grass, and assumed that his wife would keep Ashley in the house during the task's duration. (*See* Mr. Shoff Dep., at 37, 88).

At the time of his deposition, Mr. Shoff did not recall the exact events leading up to Ashley's injury. However, Mr. Shoff did remember mowing the front lawn for about 30 minutes until he heard his wife "holler." (*Id.*, at 35).[1] At that point, he remembered seeing his granddaughter lying on the ground behind the tractor, with her foot "cut off." (*Id.*). Mr. Shoff remembered backing up a "little bit" prior to the accident, although he was uncertain about the distance the mower traveled in reverse. (*Id.*, at 72). Mr. Shoff did not recall whether he looked behind before putting the tractor in reverse. (*Id*, at 35–

36, 79, 81–82). Mr. Shoff did admit that he read and understood the on-product warnings and the Operating Manual upon purchasing the tractor. (*See* Mr. Shoff Dep., attached as Ex. A to Def. Br., at 78–80).

Immediately after the accident, Mr. Shoff ran into his home and called an ambulance. (*See* Mr. Shoff Dep., at 35). Ashley was ultimately transported via helicopter to the Children's Hospital of Philadelphia, Pennsylvania. (*See* Compl., at ¶ 8). As a result of the incident, Ashley's left foot was amputated. (*Id.*).

### 2. Mr. Shoff's Insurance Statement

Mr. Shoff issued a statement to the insurance company on May 9, 2003, two days after the accident. This statement goes into greater detail about the events immediately preceding the accident. In this statement, Mr. Shoff indicated that, while he was mowing the lawn, Ashley came outside of the house, picked a flower from the flower bed, and proceeded to walk over to Mr. Shoff with the flower. (*See* Mr. Shoff's Statement, attached as Ex. O to Pl. Br.). Seeing Ashley, Mr. Shoff lifted up the mower blade, while the engine of the mower was still running, accepted the flower, talked with Ashley, and then told Ashley to return to her grandmother. (*Id.*) Believing that Ashley was no longer in the area, Mr. Shoff then reapplied the mower blade, ran the mower in reverse, and ran over Ashley's foot. (*Id.*).

## D. Complaint

Plaintiff filed a complaint against Simplicity on January 9, 2004. (Doc. No. 1). The complaint contains two counts: a strict products liability claim (Count I) and a negligence claim (Count II) against Sim-

---

1. Mrs. Shoff did not witness the accident. (*See* Mrs. Shoff Dep., attached as Ex. G to Def. Br., at 7). Instead, she arrived on the scene after hearing Ashley's cries, only to find Ashley on the ground behind the tractor. (*Id.*, at 7–8).

plicity. (*See* Compl., at ¶¶ 10–12). The crux of both claims is that the design of, and instructional warnings on, the mower were defective, both under a strict liability and a negligence analysis. (*Id.*, at ¶¶ 10(f)-(1), 12). On March 9, 2004, Simplicity filed a third-party complaint against Mr. and Mrs. Shoff (Doc. No. 14), which was later amended (Doc. No. 19) alleging that Ashley's accident was due in part to the negligent conduct of Mr. and Mrs. Shoff. (*See* Am. Third Party Compl., at ¶¶ 10–11). Simplicity's third-party complaint seeks contribution in the event of a determination of Simplicity's liability to plaintiffs. (*See* Am. Third–Party Compl., at ¶¶ 12–14). On March 3, 2005, Simplicity and third-party defendants filed the instant motions for summary judgment. (Doc. No. 32, 33).

## II. Summary Judgment Motions

Two summary judgment motions are currently before the Court: (i) Simplicity's motion for summary judgment on plaintiffs' negligent design and strict product liability claims; and (ii) third-party defendants' motion for partial summary judgment on the negligent supervision and failure to follow instructions allegations of Simplicity's contribution claim.

### A. Standard

 In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 568 (3d Cir.1986). Only

facts that may affect the outcome of a case are "material." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. All reasonable inferences from the record are drawn in favor of the non-movant. *See id.* at 256, 106 S.Ct. 2505.

 The movant has the initial burden of demonstrating the absence of genuine issues of material fact. This "burden ... may be discharged by 'showing' that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this burden is discharged, the non-movant must then establish the existence of each element on which it bears the burden of proof. *See J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990). A plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in her favor. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999); *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989); *Woods v. Bentsen*, 889 F.Supp. 179, 184 (E.D.Pa.1995).

### B. Simplicity's Summary Judgment Motion

Simplicity moves for summary judgment on plaintiffs' strict liability and negligence claims.

#### 1. Strict Liability

 The Pennsylvania Supreme Court has adopted Section 402A of the Restatement (Second) of Torts. *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966). According to Pennsylvania's interpretation of Section 402A, a determination of whether a product is defective requires a two-

438

step analysis: (i) whether, as a matter of law, the product was unreasonably dangerous to the intended user or consumer; and (ii) if so, whether as a matter of fact for the jury, the product was sold in a defective condition. *See Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020, 1026 (1978). The "unreasonably dangerous" analysis requires the court to determine as a matter of policy whether the risk of loss should be placed on the supplier of the product based upon a risk-utility analysis. *Id.*, at 1025–1026. If the Court determines that a product is "unreasonably dangerous," the issue of whether the product was sold in a defective condition is submitted to the jury. *See, e.g., Monahan v. Toro Co.*, 856 F.Supp. 955, 958 (E.D.Pa. 1994).

Simplicity puts forth two arguments in favor of summary judgment: (i) Ashley was not an "intended" user of the product; and (ii) the mower was not "unreasonably dangerous" because plaintiffs cannot establish as a matter of law that a safer alternative design exists that would have prevented plaintiffs' injuries. Both of these arguments challenge whether the mower was unreasonably dangerous to the intended user or consumer of the product.

### a. Intended User

Simplicity argues that in order for plaintiffs to prevail under their strict liability claim, they must establish that Ashley was an intended user or consumer of the product. Because Ashley was not the intended user of the mower, Simplicity argues that plaintiffs' strict liability claim fails as a matter of law. (*See* Def. Br., at 14).

Plaintiffs, on the other hand, argue that a strict liability claim under Pennsylvania law does not in all instances require the person who suffered injury to be the intended user of the product. (*See* Pl. Br., at 9–13). Instead, a strict liability claim

may proceed when the plaintiff is an innocent bystander, independent of whether plaintiff was an intended user or consumer or whether the product was safe for its intended user or consumer. (*Id.*).

### i. Restatement Principles

■ Pennsylvania has adopted Section 402A of the Restatement (Second) of Torts. *See, e.g., Webb*, 422 Pa. 424, 220 A.2d 853. Section 402A states:

One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*See* Restatement (Second) of Torts § 402A (1965). In other words, a strict liability claim under Section 402A requires a plaintiff to establish four elements: (1) the defendant sold a product; (2) the product was unreasonably dangerous to the ultimate user or consumer; (3) the defect was the proximate cause of injuries to the ultimate user or consumer; and (4) the product was in substantially the same condition at the time of the accident as when it was sold by the defendant. *Id.*

■ The commentary to Section 402A defines "user" and "consumer" in broad terms. *See* Restatement (Second) of Torts § 402A, at Comment 1. A "user" includes all persons who passively enjoy the benefit of the product, including all those who utilize a product for the purpose of doing work upon it. *Id.* The term "consumer" is defined in equally broad terms, including all persons who use a product in its intended manner. *Id.* However, while defining the terms "consumer" and "user" broadly,

the commentary acknowledges that courts have "not gone beyond allowing recovery to users and consumers," such as providing relief to casual bystanders and others who may "come in contact with the product." *Id.*, at Comment O. Nonetheless, recognizing that "there may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded," the authors of Section 402A expressed no opinion as to whether "persons other than users or consumers" could (or, in fact, should) recover under a strict liability theory for a defective product. *Id.; see also* Caveat 1.

The American Law Institute recently promulgated the Restatement (Third) of Torts. Section 1 of the Restatement (Third) of Torts simplifies the standard for strict liability previously contained within Section 402A:

> One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.

*See* Restatement (Third) of Torts: Product Liability § 1 (1998).[2] The elision of the requirement that the plaintiff be the "user or consumer," coupled with its replacement by the phrase "harm to persons or property caused by the defect," suggests an intent to permit recovery under a strict liability theory to all persons affected by a defective product. *Id.; see also* Am. L. Prod. Liab.3d § 16:56 (2004) (suggesting that drafters "appear to be sanctioning claims by all foreseeable persons affected by a defective product"). This broad class

of potential plaintiffs includes bystanders harmed by a malfunctioning product.

### ii. Pennsylvania case law

■ Pennsylvania jurisprudence has long interpreted Section 402A as requiring a manufacturer to ensure that a product leaves its control with every element necessary to make the product safe for its "intended use." *Azzarello*, 391 A.2d at 1027. Stated differently, a product will be deemed defective under Pennsylvania law only if it "left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Id.* This interpretation is grounded less in the text of Section 402A, than in the policy considerations associated with the concepts of "ultimate user and consumer," the definitions of which dictate whether a particular plaintiff may recover under a strict liability theory. *See* 3 West's Pa. Prac. § 9.66 (2004) (concept of intended use is "implicit" in Section 402A).

The "intended use" requirement has evolved, through judicial interpretation, into the rule that a product need only be made safe for its "intended user." *Parks v. AlliedSignal, Inc.*, 113 F.3d 1327, 1331 (3d Cir.1997) ("plaintiff must show that a product is unreasonably dangerous to intended users for its intended use"); *Metzgar v. Playskool, Inc.*, 30 F.3d 459, 463 (3d Cir.1994) (manufacturer exonerated when "use giving rise to a strict liability cause of action is a reasonably obvious misuse, or the user a reasonably obvious unintended user"); *Mackowick v. Westinghouse Elec-*

---

**2.** Under § 2 of the Restatement (Third) of Torts: Product Liability, a design defect exists "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alter-

native design renders the product not reasonably safe." *Id.* This conceptualization of "design defect" removes the "user or consumer" limitation, and permits recovery whenever a "product is put to uses that it is reasonable to expect a seller or distributor to foresee." *Id.*, Comment m.

*tric Corp.*, 525 Pa. 52, 575 A.2d 100, 102–103 (1990) ("warning of inherent dangers is sufficient if it adequately notifies the intended user of the unobvious dangers inherent in the product"). The rationale for this evolution is the notion that the "intended use" doctrine presupposes the participation of an "intended user." *Metzgar*, 30 F.3d at 463. In turn, this logic then reasons that because a product need only be made safe for its intended user, only an intended user of the product may recover under Section 402A. *See, e.g., Riley v. Warren Manufacturing, Inc.*, 455 Pa.Super. 384, 688 A.2d 221, 228–230 (1997) (manufacturer only liable for injuries to intended user or consumer).

The Pennsylvania Supreme Court recently addressed the "ultimate user" doctrine in the context of a design defect, answering the question of who may recover for a design defect under a strict product liability cause of action. In *Phillips v. Cricket Lighters*, 576 Pa. 644, 841 A.2d 1000 (2003), a two-year old child reached into his mother's purse, retrieved a disposable butane cigarette lighter manufactured by defendant, used the lighter to ignite several linens, and started a fire that spread throughout the apartment. *Id.* at 1003. The two-year old child, his mother, and another minor child died in the fire. *Id.* One child, who managed to escape from the apartment, survived. *Id.* The administratrix of the estate of the three decedents, who was also the guardian of the sole surviving child, filed a complaint on behalf of all parties against the manufacturers and distributors of the lighter, alleging a strict liability claim for failure to design the lighter with a child-resistant feature. *Id.*

The six justices who heard the case concluded that the strict liability claim on behalf of all injured parties (i.e., the child who caused the fire by using the lighter and the bystanders) failed as a matter of law, albeit with different reasoning. Two justices reasoned that the "intended user" doctrine barred recovery because the butane lighter was intended to be used solely by adults, rather than by a two-year old child, and no evidence was introduced to indicate that the lighter "was unsafe for use by such an intended user." *Id.*, at 1007, 1023. These justices emphasized that although the two-year old child might have been a reasonably foreseeable user, the concept of foreseeability, derived from negligence law, deserves no place within a strict liability framework. *Id.*, at 1006–1008, 1023.[3]

On the other hand, three justices suggested a desire to retreat from the harsh application of the "intended user" doctrine. These justices expressed approval of the Restatement (Third) of Torts, and its blending of negligence principles into a strict liability design defect claim, including the replacement of the "intended user" doctrine with the "reasonably foreseeable use" standard. *Id.* at 1018–1019. However, as these three justices choose only to provide "prospective" guidance on how Pennsylvania law should progress, they applied "present" Pennsylvania law to find that the two-year old child was not the intended user of the lighter and that the strict products liability claim was barred. *Id.* at 1019.

Plaintiffs do not dispute that the holding in *Phillips*-that a plaintiff must establish that a product was "unsafe for its intended user" to succeed on a strict liability claim—reflects the current state of Pennsylvania products liability law. However, plaintiffs seek to distinguish *Phillips* by compartmentalizing its application of the intended user doctrine. Specifically, plain-

---

**3.** One justice concurred in this result, without articulating his reasoning.

tiffs argue that although *Phillips* addressed the intended user doctrine, particularly when a child "misuses" an allegedly defective product, this case did not intend to establish an exhaustive limit on what groups of plaintiffs may recover under § 402A, indeed, that this case did not intend to foreclose other classes of plaintiffs, such as innocent bystanders, from recovering on a strict liability claim. In other words, any person may recover whenever a defective product is being used in its intended manner, including innocent bystanders, but not when a defective product is being misused. Phrased yet again, the appropriate limitation on who may recover under a strict product liability theory is whether the product caused injury during its intended use, not whether an intended user suffered injuries. (*See* Pl. Br., at 11–12).

Plaintiffs attempt to buttress their position with case law from the Pennsylvania Supreme Court and from several federal district courts within the Third Circuit. Although plaintiffs admit that there "has not been express recognition by the Pennsylvania Supreme Court of a bystander's right to bring a product liability claim" (Pl. Br., at 9), plaintiffs cite several Supreme Court cases that have permitted non-user/non-consumers to recover under a strict liability theory, thereby implicitly reaching the conclusion that bystanders may recover. *See, e.g., Webb,* 220 A.2d at 854 (permitting plaintiff to amend complaint to state claim under strict products liability theory for injuries suffered when he entered room in which exploding beer keg had been placed, even though plaintiff neither purchased nor used the keg); *Pegg v. General Motors,* 258 Pa.Super. 59, 391 A.2d 1074, 1078–1079 (1974) (vacating directed verdict for manufacturer and granting new trial for plaintiff injured when allegedly defective chemical combusts in plaintiff's car). Furthermore, plaintiffs correctly note that several federal district courts in the Third Circuit have also permitted innocent bystanders, who were not the intended user of a product, to recover for injuries caused by a defective product under a strict liability claim. *See, e.g., Stratos v. Super Sagless Corp.,* 1994 WL 709375, at *5 (E.D.Pa. Dec.21, 1994) (permitting administrator of seventeen month daughter's estate to bring strict liability claim against manufacturer of allegedly defective bed even though deceased was "non-user of the product who wandered into the product's danger zone"); *Fedorchick v. Massey–Ferguson, Inc.,* 438 F.Supp. 60, 63–64 (E.D.Pa.1977) (holding that Pennsylvania appellate courts would extend Section 402A's coverage to innocent bystanders).

Plaintiffs' analysis, although morally and logically appealing, is problematic within the framework of Pennsylvania law. First, as plaintiffs concede, no Pennsylvania appellate court has ever expressly carved out an innocent bystander exception to Section 402A (i.e., product must be safe for intended user and innocent bystanders who come into contact with product). Indeed, holdings from the Pennsylvania Supreme Court or the Pennsylvania Superior Court that seem implicitly to permit recovery for innocent bystanders may simply reflect the litigants' failure to raise an "intended user" defense before the trial court. *See* Pa. R.A. P., Rule 302 ("Issues not raised before the lower court are waived and cannot be raised for the first time on appeal.") Whatever the case may be, the failure of Pennsylvania's appellate courts to discuss and to recognize an innocent bystander exception to the intended user doctrine, indeed, their very silence on this issue, cannot be read as an implicit approval of the designated exception.

Second, recognition of an innocent bystander exception deviates from modern

Pennsylvania products liability jurisprudence and the treatment of the intended user doctrine within this jurisprudence. For instance, most recently, six justices of the Pennsylvania Supreme Court reiterated that to recover under a strict liability cause of action, "the plaintiff must establish that the product was unsafe for its intended user," albeit with three justices expressing dissatisfaction with the narrowness of such a limitation. *See Phillips*, 841 A.2d at 1007. Applying this doctrine, the *Phillips* Court then denied recovery to those bystanders whose death was caused by a two-year old child's use of the lighter. To recognize a blanket innocent bystander exception, so that a manufacturer must make a product safe for its intended user and all bystanders in proximity to the product during its application, would eviscerate the holding of the *Phillips* Court and its underlying rationale. It would also reject those Pennsylvania decisions applying the intended user doctrine that formed the precedential foundation for the *Phillips* decision. *See, e.g., Van Buskirk v. West Bend Co.*, 100 F.Supp.2d 281, 285 (E.D.Pa.1999) (guardians of child burned by allegedly defective fryer may not recover on strict product liability theory in part because child was innocent bystander, rather than intended user); *Riley*, 688 A.2d at 229 (affirming directed verdict in favor of manufacturer on strict liability claim because child who placed fingers into allegedly defective bulk feed trailer during grandfather's use of trailer was not the intended consumer or user of the product and had no reason to come in contact with it).

Finally, this Court fails to understand what principled distinction exists between an unintended consumer who suffers injuries through use (or misuse) of an allegedly defective product and a bystander who suffers injuries through proximity to an allegedly defective product. Any discerni-ble distinction further disappears when the unintended consumer of the allegedly defective product is a small child who lacks the mental capacity to recognize and avoid such (mis)use. In other words, it would be patently unfair to deny recovery to a two-year child who is injured during her use of an allegedly defective adult product, while, at the same time, permitting the guardian of a two-year child to recover when an allegedly defective adult product malfunctions in the child's presence, causing injury. The intended user doctrine resolves this paradox in favor of denying recovery for both classes of plaintiffs.

In summary, this Court expresses grave doubts as to the logic of preventing an innocent bystander from recovering for injuries caused by an allegedly defective product, particularly when the American Law Institute, through the Restatement (Third) of Torts: Product Liability, has retreated from the very genesis of the "intended user" doctrine (i.e., Section 402A's ultimate user or consumer standard). However, as reiterated by the *Phillips* decision, the "intended user" doctrine, and its various permutations, remains the law of Pennsylvania. *See, e.g., Riley*, 688 A.2d at 229 (no recovery for child who is "obvious unintended user" of allegedly defective product). Accordingly, this Court is constrained to reason that the Pennsylvania Supreme Court would reject the decisions of *Stratos* and *Fedorchick*, which have expressly carved out an exception to the intended user doctrine for innocent bystanders, in favor of the unyielding rule that no subset of the population may recover under Section 402A, unless the product is unsafe for its intended user or consumer, however broadly defined.

### iii. Application

█ Application of the intended user or consumer doctrine to the instant set of

facts yields the conclusion that Ashley may not recover under a strict liability theory. Ashley did not purchase the mower from Simplicity. Nor was Ashley operating the tractor at the time she sustained injuries. In fact, Ashley was not even a passive beneficiary of the mower's benefits, as she neither lived nor had an ownership interest in the Shoff's property. Furthermore, the on-product and in-manual warnings makes it clear that children are not to operate the mower, and, in fact, that the mower should not be operated in the presence of children. (*See* Pictures, at No. 16; Operator's Manual, at 3–4). Finally, plaintiff has not suggested, let alone made an evidentiary showing, such as through expert testimony, that the mower was dangerous for its intended user, an adult operator.[4] Consequently, because Ashley was an innocent bystander, rather than an intended user or consumer, and because plaintiffs have introduced no evidence to suggest that the mower was unsafe for its intended user, plaintiffs may not recover against Simplicity under Pennsylvania law for injuries Ashley sustained as a result of the alleged defect in the mower.[5] Simplicity's motion for summary judgment on Count I of plaintiffs' complaint is therefore granted.[6]

### 2. Negligence Claim

Simplicity argues that plaintiffs' negligence claim fails as a matter of law. First,

4. Plaintiffs' argument is that the mower was unsafe for minor bystanders who are "in the wrong place, at the wrong time," and who thereby come into contact with the blades of the mower. (*See* Pl. Br., at 12).

5. Because this Court finds both that Ashley was not an intended user and that the mower was safe for its intended user, this Court need not decide whether innocent bystanders are always precluded from recovery under strict liability, even when the product at issue is unsafe for its intended user.

Simplicity argues that it owed no duty of care to Ashley to design the mower with plaintiffs' proposed safety features. (*See* Def. Br., at 15–25). Second, assuming *arguendo* that Simplicity owed and breached a duty of care to Ashley, Simplicity argues that no causation exists because plaintiffs failed to identify a safer alternative design or warning that would have prevented Ashley's injuries. (*Id.*, at 25).

### a. Duty of Care

Whether a defendant owes a duty of care to a particular plaintiff is a question of law. *See, e.g., Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366 (3d Cir.1993). To determine whether a defendant owes a duty of care under Pennsylvania law, a court must consider five factors: (i) relationship between the parties; (ii) social utility of the defendants' conduct; (iii) nature of the risk imposed and foreseeability of the harm incurred; (iv) consequences of imposing a duty upon the defendant; and (v) the overall public interest in the proposed solution. *Phillips*, 841 A.2d at 1008; *Althaus v. Cohen*, 562 Pa. 547, 756 A.2d 1166, 1168 (2000). As no one factor is dispositive, a court must impose a duty of care when the balance of these factors weighs in favor of placing such a burden on a defendant. *Id.* at 1008–9.[7]

6. Because this Court finds that the intended user doctrine precludes recovery by plaintiffs under a strict liability theory, this Court does not resolve Simplicity's alternative argument that the mower was not "unreasonably dangerous" because plaintiffs failed to provide evidence of a safer, alternative design. (*See* Def. Br., at 25).

7. The analysis of whether a manufacturer owes a duty of care to an injured plaintiff in a negligent design case is analogous to the inquiry of whether a court should place the loss on a particular manufacturer for designing a defective product in a strict product liability

■ Based upon an analysis of the relevant factors, this Court concludes as a matter of law that Simplicity did not owe a duty to Ashley to design the mower in accordance with plaintiffs' proposed safety features.

### i. Relationship Between The Parties

Simplicity argues that no relationship exists between Simplicity and Ashley, as Ashley did not purchase the subject lawn mower. (*See* Def. Br., at 16). Plaintiffs admit that the relationship prong weighs in favor of no duty of care. (*See* Pl. Br., at 14 n. 9).

### ii. Social Utility of Defendants' Conduct

The social utility prong evaluates the social utility of producing a mower without additional safety features. Simplicity argues that a lawn mower is an effective, reliable, and convenient way to cut grass; that plaintiffs' proposed safety features do not increase the safety of the mower, and that any safety feature that would have prevented Ashley's accident, such as a lawn mower without *any* capacity to mow in reverse, undermines the machine's functionality. (*See* Def. Br., at 16–17). Plaintiffs, on the other hand, argue that a mower that lacks safety features to prevent and/or to minimize the risk of back-over injuries contains very little social utility. (*See* Pl. Br., at 14).

This Court finds that a lawn mower that lacks the capacity to mow in reverse loses a large degree of its social utility as an efficient and reliable tool to cut grass. Indeed, as Simplicity contends, operators frequently need to cut grass in reverse, depending on the contours of the landscape. Operators also need to reposition their mower by backing up. To deny operators the capacity to perform these basic maneuvers, with the mower deck engaged, would add significant time and frustration to the lawn-mowing task. Accordingly, this Court finds that there is substantial social utility to designing and manufacturing a mower that permits an operator to mow in reverse.

This Court also finds that plaintiffs have failed to present evidence indicating that an NMIR device, which shuts down the mower if an operator engages the mower blades while operating in reverse, would increase the product's safety. According to plaintiffs' expert, E. Smith Reed, Jr., an NMIR feature, based upon 1994 technology, would still allow an operator to mow in reverse for at least 4 and 1/2 feet, while the blades are spinning, before the engine shuts off. (*See* Reed Report, at 25 n. 8). Furthermore, in 1993, the time the mower was manufactured, the Consumer Product Safety Commission ("CPSC") had expressly refused to promulgate a consumer standard requiring an NMIR device on riding mowers because of a lack of data about how many injuries would be prevented by the addition of a NMIR feature and because of the fear that the increased number of maneuvers demanded by a mower

case. *See, e.g., Schindler v. Sofamor, Inc.*, 774 A.2d 765, 774 n. 7 (Pa.Super.2001). Both require considerations of policy, rather than the application of moral precepts, and center upon the fundamental question of who should bear the risk of loss in a particular factual context.

Nonetheless, the two questions are, and must be kept, conceptually distinct, as the Pennsylvania Supreme Court has continuously mandated the disentanglement of negligent principles from the doctrines that comprise strict products liability jurisprudence. *See Phillips*, 841 A.2d at 1007 (reaffirming that "negligence concepts should not be imported into strict liability law"). Indeed, the focus of the negligence analysis is on the manufacturer's conduct in designing, creating, and distributing a product, rather than upon the degree of perfection of the product itself.

with a NMIR device would lead to operator frustration, which, in turn, would lead to the disabling of the device.[8] (*See* July 19, 1993 Letter from CPSC, attached as Ex. L to Def. Br.).[9] More problematically, although plaintiffs argue that a competitor of Simplicity, MTD Products Inc. ("MTD"), started selling mowers with a NMIR device in 1982 and that this type of mower "completely eliminated back-over blade contact accidents," Simplicity has provided several example of injuries arising from back-over accidents involving MTD-branded mowers, including a 2004 lawsuit filed on behalf of a four-year old child who was allegedly killed when an MTD riding mower backed over the child's body with the blades running. (*See* Examples of Back-over Accidents, attached as Ex. O–R to Def. Reply Br.).[10] Finally, the Court notes that plaintiffs' expert presented no studies indicating that an NMIR device eliminates or significantly reduces back-over blade accidents. Indeed, plaintiffs' expert implicitly conceded during his deposition that such a comparative analysis was lacking because he performed no statistical analysis to determine: the rate of back-over blade injuries for mowers with NMIR features with overrides; the difference in the rate of back-over blade injuries between mowers with NMIR fea-

tures and those without such features; and the rate of back-over blade injuries for mowers with a disabled NMIR feature. (*See* Reed Dep., attached as Ex. H to Def. Br., at 101–102, 29–30, 112, 117–118). Accordingly, this Court finds not only that an NMIR device reduces the social utility of the mower, but also that plaintiffs have failed to present evidence to show that an NMIR device, as defined by plaintiffs' expert, increases safety by reducing back-over blade accidents.

Plaintiffs also identify an array of additional safety mechanisms that would permit an operator to mow in reverse, thereby maintaining the functionality of the mower, while, at the same time, increasing the social utility of the mower by reducing back-over accidents. These features include: (i) roller guards on the rear of the mowing deck to reduce the intrusion of objects into the mower blades; (ii) NMIR feature with an operator override; and (iii) additional warnings. (*See* Pl. Br., at 1; Reed Report, at 25–31); *see, e.g., Phillips,* 841 A.2d at 1009 (comparing social utility of product without identifiable safety features with social utility of product with identifiable safety features).

Despite identifying these various safety mechanisms, however, plaintiffs have of-

8. Plaintiffs' expert recalled a study from the late 1980's confirming that at least 40% of operators disabled NMIR features on their mowers. (*See* Reed Dep., at 113). Plaintiffs' expert further testified that he conducted no studies on the rate at which NMIR systems are disabled. (*Id.,* at 114).

9. In fact, although the CPSC published a "proposed safety standard" in the Federal Register in 1977 requiring an NMIR device to be placed on all riding mowers, the CPSC withdrew this standard in 1984, on the basis that the CPSC could not "draw the statutorily required conclusion that the cost of incorporating the features needed to comply with the proposed requirements would be justified by any benefits to be obtained." (*See* Withdraw-

al of Proposed Rule, attached as Ex. F to Pl. Br.).

10. Furthermore, this conclusion derives not from statistical analysis, but, instead, from the testimony of Gunter Plamper, MTD's Vice President for Product Development and Safety, both in a letter dated August 17, 2001 to Good Morning America and in a 1992 deposition in an unrelated action. (*See* August 17 Letter, attached as Ex. H to Pl. Br.; Reed Report, at 26–27). Tellingly, plaintiffs' expert admitted that he never read the entirety of Plamper's 1992 deposition, nor have plaintiffs attached this deposition to their brief in opposition to Simplicity's summary judgment motion. (*See* Reed Dep., at 31–32).

fered no evidence to indicate that such features, if implemented, would actually improve safety by decreasing back-over injuries. First, plaintiffs' expert refused to testify that the use of roller guards or other guarding near the mowing deck would make the mower "reasonably safe," in part because plaintiffs' expert lacked information "on the performance of rollers in preventing child back-over blade contact accidents." (*See* Reed Dep., at 84).

Second, plaintiffs' expert testified at his deposition that any NMIR device would have to be accompanied by specific warnings, which plaintiffs' expert had yet to develop. (*Id.*, at 95–96, 100–101, 199). Nor did plaintiffs' expert conduct testing to determine what language would be effective in stopping an operator from initiating the override and using the mower in reverse. (*Id.*, at 95–96, 198–200). Furthermore, this Court fails to see how a "no mow in reverse device" with an override would prevent future back-over accidents, particularly because this feature would allow an operator to continue mowing in reverse by pushing a button or switch.[11] This is the practical equivalent to the current design of the instant mower-both allow the operator to choose whether or not to mow in reverse, without first verifying the absence of persons immediately behind the mower.

Third, to the extent that plaintiffs argue that additional warnings would increase the safety of the machine, thereby also increasing its social utility, this Court fails to understand what additional warnings would be more effective in preventing back-over accidents, as Simplicity provided specific on-product and in-manual warnings prohibiting operation of the vehicle in

the presence of children, commanding operators to look behind them before mowing in reverse, and delineating the physical consequences of failing to clear the field of operation of the mower's blades. (*See* Pictures, at No. 16; Operator's Manual, at 3–4). Indeed, plaintiffs' own expert stated at his deposition that additional in-manual and on-product warnings, standing alone, would not be effective in preventing future accidents. (*See* Reed Dep., at 167–168).

This Court finds that a mower that permits an operator to maneuver in reverse, with the blades engaged, carries significant social value. This Court also finds that plaintiffs failed to make a showing that the proposed safety features would increase the safety of the machine by decreasing back-over accidents. Accordingly, because the implementation of plaintiffs' proposed safety features would decrease the social value of the product by thwarting its functionality as an efficient, time-effective tool for grass-cutting, without any concomitant increase in safety, this factor weighs against finding a duty of care on behalf of Simplicity.

### iii. Nature of the Risk and Foreseeability of Harm

Simplicity argues that while a risk of injury to bystanders for a product with steel blades obviously exists, this risk is not so foreseeable as to warrant the imposition of an additional duty. In support of its argument, Simplicity points to the alleged statistical infrequency of back-over blade contact incidents. For example, since 1983, Simplicity claims that it was aware of just two other incidents where someone alleged that a mower Simplicity manufactured was involved in a back-over

---

**11.** Plaintiffs' expert admitted that he conducted no studies to determine whether an operator, using a mower with a NMIR feature with an override, was more likely to activate the override at the beginning of the mowing session or to disengage the mower deck prior to operating in reverse. (*See* Reed Dep., at 200).

accident. (*See* Def. Br., at 22; Brackin Dep., attached as Ex. O to Def. Br., at 298–291).

Plaintiffs, on the other hand, adduce the expert report of Reed, who testifies that studies over the last thirty-five years reiterate "the frequency of children being backed over by ride-on mowers and the frequency of them coming in contact with the spinning blades." (*See* Plaintiffs' Expert Report, attached as Ex. A to Pl. Br., at 19). Plaintiffs' expert testifies that back-over accidents involving mowers happen at a frequency of 1 accident per 5,000/6,000 mowers produced (over the lifetime of the mower) (*Id.*, at 20). Plaintiffs' expert also testifies that more than 100 hospitalizations per year take place because of back-over blade contact accidents. (*Id.*).

This Court acknowledges that a risk of danger of back-over blade accidents exists whenever an operator uses the instant type of mower. This Court also recognizes that many studies adduced by plaintiffs' expert were published between 1981 and 1993 and that these studies provided the raw data to reach the statistical conclusion that 1 riding mower per 5,000 to 6,000 produced is involved in a back-over blade contact accident at some point during the mower's life-span. (*See* Reed's Report, at 18–22).

On the other hand, this Court also agrees that other factors undermine the foreseeability of the risk of injury at the time of the design and manufacture of the mower. For instance, although the CPSC published a "proposed safety standard" in the Federal Register in 1977 requiring an NMIR device to be placed on all riding mowers, this proposed standard never took effect. (*See* Proposed Rule, attached as Ex. E to Pl. Br., at 230). In 1984, the proposed standard was withdrawn, based upon the inability of the CPSC to "draw the statutorily required conclusion that the cost of incorporating the features needed to comply with the proposed requirements would be justified by any benefits to be obtained." (*See* Withdrawal of Proposed Rule, attached as Ex. F to Pl. Br.). Furthermore, in 1993, a year before the instant mower was assembled, the CPSC expressly refused to recommend implementation of a safety standard requiring manufacturers to incorporate NMIR devices. (*See* Terry Van Houten, *Control Lawyout Report for Riding Mowers*, attached as Ex. J to Def. Br., at 2). The CPSC stated that it lacked "sufficient information to determine how many deaths or injuries would be prevented by [a no mow in reverse] feature." (*See* CPSC Letter, dated July 19, 1993, attached as Ex. L).[12]

This Court finds that a risk of back-over blade contact injuries exists and that this risk was somewhat foreseeable at the time of the design and manufacture of the instant mower. Nonetheless, as this risk of injury was not significant to justify promulgation by the CPSC of a final regulation mandating or voluntarily prescribing incorporation of NMIR devices, this Court finds that this factor only marginally points in favor of finding a duty of care on behalf of Simplicity.

### iv. Consequences of Imposing the Duty

Simplicity contends that although the costs of imposing a duty would be finan-

---

**12.** Importantly, the CPSC drew this conclusion despite awareness of the very studies that plaintiffs' expert relied upon in forming his conclusion that a NMIR feature, coupled with additional warnings, would have prevented Ashley's injuries. (*See* Reed Report, at 30, ¶¶ 7–12). Indeed, plaintiffs' expert relied exclusively upon CPSC data in determining the rate of back-over blade injuries involving riding mowers. (*See* Reed Dep., at 17–19).

cially marginal, the social costs would be great. In particular, Simplicity contends that a NMIR feature would lead to operator frustration, thereby leading to additional injuries to the operator or other persons. (*See* Def. Br., at 23–24). On the other hand, plaintiffs evaluate the consequences prong in terms of financial and technological expenses. Plaintiffs contend that the expense of incorporating a NMIR device is minimal, costing approximately $9 per mower. (*See* Pl. Br., at 15 n. 12).

This Court agrees with plaintiffs' argument that the financial costs of imposing a NMIR device are minimal.[13] However, because plaintiffs have failed to demonstrate a feasible design alternative that would reduce the likelihood of back-over blade accidents while maintaining the social utility of the product, imposing such a duty would be superfluous. It would certainly not justify the financial consequences, however marginal. This factor therefore weighs in favor of no duty.

### v. Public Interest

Simplicity argues that the public interest would not be served by imposing a duty because this duty would transform Simplicity into the insurer of its products, an obligation that Pennsylvania law does not countenance. (*See* Def. Br., at 25). More specifically, Simplicity argues that the imposition of such a duty in this factual context would be an unfair way of penalizing Simplicity for the lack of adult supervision over Ashley on the date of the accident. This penalization is clear, according to Simplicity, when the consequences of the duty are identified: requiring the addition of a device with unproven effectiveness to minimize the risk to a person who should not be in the field of the product's operation. (*Id.*, at 25).

Plaintiffs argue that this is precisely the situation in which the public interest is served by imposing a duty of care on Simplicity. The marginal costs of designing a product with a NMIR feature, coupled with the benefit of reducing severe physical injury to children, who often behave unpredictably, satisfy the public interest prong of the test. (*See* Pl. Br., at 15).

This Court finds that the public interest is not served by imposing a duty on Simplicity to design a mower with plaintiffs' proposed safety features. Simplicity's product included numerous safety features, as well as on-product and in-manual warnings prohibiting the use of the mower around children. More importantly, plaintiffs fail to establish a genuine issue of material fact as to the effectiveness (at the time of the design of the mower) of the proposed features, from rollers to an NMIR device to an NMIR device with an override, in increasing the safety value of the mower. To impose an additional duty on Simplicity to incorporate plaintiffs' proposed, but unproven, safety features not only would devalue the social utility of the mower, preventing its ability to cut grass in a time-effective and efficient manner, but also would transform Simplicity into an insurer of its products in violation of Pennsylvania law. *See Azzarello*, 391 A.2d at 1024 (manufacturer not "insurer of all injuries caused by the product").

### vi. Conclusion

In *Phillips*, the Court found that plaintiff made a sufficient showing to survive summary judgment on the issue of whether a cigarette lighter manufacturer owed a duty of care to two-year old child to design a product with a child safety feature. *See* 841 A.2d at 1010. However, unlike the factual pattern in *Phillips*, plaintiffs have

---

**13.** Simplicity agrees with this conclusion, too. (*See* Def. Br., at 23).

presented no evidence to indicate that the design of the instant mower with additional so-called "safety" features would actually increase the safety of the mower, without impairing its social utility. Plaintiffs' failure to make such a showing is fatal to their negligence claim. Accordingly, weighing all of the relevant factors, this Court finds that Simplicity did not owe a duty to design and manufacturer the mower with plaintiffs' proposed safety features.[14]

### C. Third–Party Defendants' Motion

Third-party defendants moved for summary judgment on the negligent supervision allegations against both Mrs. and Mr. Shoff and on the allegation against Mrs. Shoff for failure to follow instructions. Presumably, the entry of summary judgment in favor of Simplicity and the dismissal of plaintiffs' complaint moots the contribution claim against third-party defendants, and, hence, the need to resolve third-party defendants' motion for summary judgment. Nonetheless, in the event plaintiffs are successful on a motion for reconsideration or on appeal, and because Simplicity has not argued for dismissal based upon principles of mootness, this Court will decide third-party defendants' motion.

### 1. Negligent Supervision

Third-party defendants argue that liability for negligent supervision depends on whether the supervising party "had prior knowledge of a specific propensity for the child to act in the way that resulted in the injury taking place." (*See* Pl. Br., at 7). In turn, because third-party defendants had no knowledge of plaintiffs' propensity to enter the yard during the operation of the mower, third-party defendants cannot be liable under a negligent supervision theory. (*Id.*).

Simplicity, on the other hand, argues that Pennsylvania law does not require a showing of propensity. Instead, in order to state a negligent supervision claim against a guardian for failing to control the conduct of a child, plaintiffs need only establish that the guardian knew or had reason to know both of her ability to control the child and of the necessity and opportunity for exercising control. (*See* Def. Br., at 3). Consequently, because third-party defendants testified that they knew plaintiffs could sustain a severe injury by coming into contact with the rotating mower blades, a jury could conclude that third-party defendants had a duty to keep Ashley in the house while Mr. Shoff mowed the lawn. (*Id.*, at 4).

Both parties rely upon § 316 of the Restatement (Second) of Torts as governing Simplicity's contribution claim against third-party defendants for their alleged negligent supervision of Ashley. *See K.H. v. J.R.*, 573 Pa. 481, 826 A.2d 863, 873 (2003) (adopting and applying § 316). Section 316 states:

> A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent: (a) knows or has reason to know that he has the ability to control his child; and (b) knows or should know of the necessity and opportunity for exercising control.

*See* Restatement (Second) of Torts § 316. The plain language of § 316 does not re-

---

14. Because this Court finds no duty of care as a matter of law, it need not address Simplicity's alternative argument that plaintiffs failed to introduce evidence of a reasonable, alternative design that would have prevented Ashley's injuries. (*See* Def. Rpl. Br., at 5).

quire a showing of propensity. In fact, the plain language of § 316 does not even apply to this factual context—where a child injures herself (as compared to others) due to the alleged negligent supervision of a grandparent.

 Third-party defendants cite no controlling case under Pennsylvania law that requires a showing of propensity (i.e., guardian's knowledge that child may act in a certain way based upon guardian's awareness of previous behavior) to prevail under a negligent supervision theory. Indeed, Pennsylvania law imposes a duty to exercise reasonable care to control a child when a parent "knows or should know of the need to exercise parental control and has the ability and opportunity to do so." *J.H. v. Pellak*, 764 A.2d 64, 68–69 (2000); *see also K.H. v. J.R.*, 573 Pa. 481, 826 A.2d 863, 873 (2003) (duty of parent to control conduct of child limited to those instances "in which a parent has the ability to control the child, knows of its necessity, and has the opportunity to do so"). Although knowledge of the propensity of a child to act in a certain manner based upon prior behavior may satisfy the "necessity" prong of this fact-intensive standard (i.e., "knows or should know of the need to exercise parental control"),[15] third-party defendants present no Pennsylvania case law that prescribes this evidentiary path as the exhaustive method of satisfying the § 316 standard. Instead, under Pennsylvania law, a plaintiff may succeed on a negligent supervision claim under § 316 so long as the particular facts demonstrate both that the guardian reasonably recognized or should have recognized the present imminence of harm absent parental control and that the guardian possessed the present ability and opportunity to exercise this control.[16]

 Applying the principles of § 316, this Court concludes that facts exist from which a reasonable jury could find that both Mr. and Mrs. Shoff negligently failed to supervise Ashley, then four-years old, at the time of accident.[17] *See* Restatement (Second) of Torts § 316, comment c ("the very youth of the child is likely to give the parent more effective ability to control its actions and to make it more often necessary to exercise it"). First, Mr. and Mrs. Shoff, as grandparents baby-sitting Ashley, had the ability and opportunity to control Ashley on the date of her injury. For instance, Mr. Shoff announced his decision to mow the lawn to his wife prior to commencing this task. (*See* Mr. Shoff Dep., at 37). As her husband started to mow the lawn, Mrs. Shoff was watching Ashley inside the house, with no physical barrier's obstructing Mrs. Shoff's view of Ashley. (*See* Mr. Shoff Dep., at 37–38; Mrs. Shoff Dep., at 33–36). Furthermore, in his insurance statement, Mr. Shoff testified that while he was mowing the lawn, Ashley approached the mower and spoke with him. (*See* Mr. Shoff's Insurance Statement, attached as Ex. 0 to Pl. Br.).

---

**15.** *See Condel v. Savo*, 350 Pa. 350, 39 A.2d 51, 53 (1944) (permitting plaintiff to proceed on theory of negligent supervision against parents who failed to prevent their child from striking other children with sticks, as parents knew of their child's habit of causing such injury in such manner).

**16.** The logic of not *per se* requiring knowledge of a child's propensity to act in a certain manner to establish the "necessity" prong is even more cogent in the instant factual con-

text, where the alleged parental negligence did not lead to a child's tortious behavior against third-parties, but, instead, to injury against Ashley directly.

**17.** In so doing, this Court rejects third-party defendants' contention at oral argument that no facts exist to support defendants' negligent supervision claim, in the absence of a propensity requirement. (*See* Oral Argument, at 46).

Rather than restraining Ashley, Mr. Shoff told Ashley to return to the house and then proceeded to continue to mow the law without guaranteeing Ashley's presence inside the home, away from the mower's field of operation. (*Id.*).

Second, both Mr. and Mrs. Shoff appreciated the risk of injury to Ashley if parental control was not exercised and if she was permitted to enter the mower's area of operation. Mr. Shoff conceded that he read the on-product and in-manual warnings documenting the possible ramifications of operating the mower in the presence of children. (*See* Mr. Shoff's Dep., at 78–80). Per these warnings, Mr. Shoff acknowledged that Ashley could sustain an injury by coming into contact with the mower's blades. (*Id.,* at 80–81). Mrs. Shoff also recognized that Ashley could sustain severe injury from the blades of the mower if left unsupervised. (*See* Mrs. Shoff's Dep., at 23–25, 29–31). In fact, when he left the house to start mowing the lawn, Mr. Shoff assumed that Mrs. Shoff would keep Ashley inside the home because "she knows better." (*See* Mr. Shoff Dep., at 88).

Consequently, because facts exist from which a jury could find that third-party defendants negligently failed to supervise Ashley at the time of her accident, this Court denies third-party defendants' motion for summary judgment on the negligent supervision allegations. *See* Russell L. Wald, 11 Am. Jr. Proof of Facts 2d 541 (2005) ("parent's failure to exercise due care in supervising and controlling the activities of his or her child, constituting negligent proximately contributing to the child's injury, is frequently a material issue of fact where recovery is sought for an injury caused by the negligence of a third person").

### 2. Failure to Follow Instructions

Third-party defendants argue that the claim of negligence against Mrs. Shoff for failure to follow instructions should be dismissed because Mrs. Shoff was not operating the mower at the time of the accident. (*See* Third–Party Def. Br., at 11). Defendants provide no substantive response to this argument.

■ This Court agrees that the failure to follow instructions theory of negligence liability against Mrs. Shoff should be dismissed. Mrs. Shoff was not operating the tractor, and thus had no responsibility to read the on-product or in-manual warnings. Simplicity's failure to respond to Mrs. Shoff's argument highlights the meritoriousness of this conclusion. Accordingly, this Court grants summary judgment to Mrs. Shoff on this component of Simplicity's negligence claim.

### D. Conclusion

For the foregoing reasons, this Court grants Simplicity's motion to dismiss Counts I and II of plaintiffs' complaint; denies third-party defendants' motion for summary judgment as to the negligent supervision claims; and grants third-party defendants' motion for summary judgment as to the allegation against Mrs. Shoff of failure to follow instructions. An appropriate order follows.

### *ORDER*

AND NOW, this 29th day of June 2005, upon consideration of Simplicity's motion for summary judgment on plaintiffs' negligent design and strict product liability claims (Doc. No. 33); plaintiffs' brief in opposition to Simplicity's motion for summary judgment (Doc. No. 40); third-party defendants' brief in opposition to Simplicity's motion for summary judgment (Doc. No. 37); Simplicity's reply briefs thereto (Doc. No. 48–49); third-party defendants'

motion for partial summary judgment (Doc. No. 32); Simplicity's brief in opposition to third-party defendants' motion for partial summary judgment (Doc. No. 34); and third-party defendants' response thereto (Doc. No. 39), it is hereby ORDERED as follows:

1. Simplicity's motion for summary judgment is GRANTED.

2. Third-party defendants' motion for summary judgment is GRANTED as to the failure to follow instructions allegation against Mrs. Shoff; and DENIED as to the negligent supervision allegations against Mr. and Mrs. Shoff.

3. The Clerk of Court is directed to close this matter for statistical purposes.